**Elmer HARRIS, Plaintiff,**

v.

**SPRINT CORPORATION, Defendant.**

**No. CIV.A.03–2370–CM.**

United States District Court,
D. Kansas.

Aug. 10, 2004.

**1234**

Brendan J. Donelon, Donelon, P.C., Kansas City, MO, for Plaintiff.

Elaine D. Koch, Bryan Cave LLP, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff filed the instant action, alleging that his inclusion in defendant's November 2002 reduction in force was retaliatory and racially discriminatory in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. This matter is before the court on defendant's Motion for Summary Judgment (Doc. 24)

■ Also before the court is plaintiff's Motion to Strike or Alternatively for Leave to File a Sur Reply (Doc. 28). In that motion, plaintiff contends that defendant's reply brief asserts a "good faith mistake" defense that defendant was required to plead at an earlier stage in the litigation. The court concludes that defendant did not in fact assert a new affirmative defense in its reply brief; rather, defendant merely continued to argue, as it did in its original motion, that its decision to terminate plaintiff was not unlawful. As such, the court denies plaintiff's motion.

### I. Facts [1]

Plaintiff, an African–American, began working for Sprint in July 2001 as a Soft-

---

**1.** The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56.

ware Engineer IV in the Wireless Web & Messaging ("WW & M") group. The WW & M group was made up of a series of subgroups or platforms, which undertook certain projects. Each platform had a technical lead who ran the platform's projects and team members who worked on the projects. While at Sprint, plaintiff served both as team member and as technical lead on various projects.

In January 2002, plaintiff received his annual performance review for the year 2001. Plaintiff's overall rating was a 3, which is defined as "fully meets expectations." Also in January 2002, Ed Mauser began serving as an informal team lead for the WW & M group. At this time, Barry McIntyre served as the group's manager, who in turn reported to Mary Bernard, director of the Application Development team, which included the WW & M group.

**Plaintiff's Complaint Against Eric Boehme**

Around January 2002, plaintiff began serving as the technical lead on the Push–to–Talk ("PTT") project. It is uncontroverted that the PTT project was very political; certain groups working on PTT sometimes attempted to take work from other groups on the project. On April 15, 2002, Mauser sent an email to plaintiff complementing him on his communication on a project. Plaintiff met with Mauser in May 2002 for a verbal quarterly performance review, at which time Mauser provided plaintiff with good feedback regarding plaintiff's job performance.

Plaintiff met for the first time in April or March 2002 Eric Boehme, a member of the PTT team and an employee in Sprint's ADSC group in Nashville, Tennessee. On May 24, 2002, Boehme sent an email to McIntyre recommending that the entire PTT project be transferred to the ADSC group in Nashville. Boehme criticized plaintiff's performance and recommended that plaintiff be removed as technical lead

of the project and replaced with a more senior technical lead from the ADSC group in Nashville. In response, Mauser and McIntyre decided to transfer a large portion of the PTT project to Nashville because ADSC had more resources than the WW & M group. As a result, all WW & M team members on the PTT project stopped working on the largest part of the project, but plaintiff continued to lead a small portion of the PTT project. Following the PTT transfer, Mauser emailed McIntyre on June 7, 2002, defending plaintiff's work on the project but stating that plaintiff needed work on his leadership and soft skills.

After learning of Boehme's request to have plaintiff removed from the project, plaintiff filed a complaint with human resources, alleging that Boehme's request was based on plaintiff's age and/or race. Plaintiff believed that Boehme's complaints about him were based upon his race due to the extreme measures Boehme took to discredit plaintiff's work. Plaintiff does not know whether Boehme knew his race before they met face to face.

At some point after plaintiff filed his complaint, plaintiff and Mauser went to lunch. During this lunch, plaintiff discussed how he thought what Boehme had said was unfair and told Mauser that he thought it might be based on his race. Plaintiff testified that, while he couldn't recall Mauser's exact words, Mauser told plaintiff to drop his complaint and that he shouldn't bring up race if he wanted to stay at Sprint very long.

Plaintiff alleges that, after he made this complaint, he got little work assigned to him, was asked to go into a mentoring program, and felt as though he was being passed up for leadership opportunities. With respect to the mentoring issue, Mauser had suggested that plaintiff seek out a mentor to assist plaintiff in developing his

soft skills. Plaintiff got upset with Mauser for suggesting that he obtain a mentor and refused to do so. However, plaintiff did not know what Mauser meant by help with his "soft skills."

Lisa Livingston, the human resources representative who supported the WW & M group, conducted an investigation of plaintiff's complaint against Boehme. Livingston's investigation included a meeting with plaintiff and McIntyre. Livingston did not find that Boehme's actions were discriminatory. Livingston concluded her investigation when she learned that Boehme's managers would coach and counsel him on his communication skills.

### Brian Castle Becomes Plaintiff's Manager

On July 27, 2002, Mary Bernard hired Brian Castle as senior manager of the WW & M team, replacing McIntyre. In early August 2002, Bernard asked Castle to rate each individual on his team. In September 2002, based on feedback from Lon France, one of plaintiff's former managers, McIntyre and Mauser, Castle plotted plaintiff in the bottom ten percent of the team. Human resources had directed Mauser and Castle to put the bottom ten percent on Performance Management Plans (PMPs), Sprint's corrective action program.

In late August 2002, plaintiff and coworker Alwyn Johnson convinced Castle to pursue control of the Location–Based Services ("LBS") project, a project which at that time was unfunded. Castle assigned to plaintiff the task of developing a PowerPoint slide show that Castle would present to Bernard in order to persuade her that WW & M should have the LBS project. It took plaintiff three weeks to complete the LBS presentation, and the end result was an eight slide, and in Castle's opinion a low quality, presentation. Plaintiff contends that he had difficulty in obtaining information on LBS from other persons at Sprint because there was no budget assigned to it and that, when he contacted persons for information, they would not be willing to provide work because the project was not funded. Mauser also contends that, during this time, Mauser received explicit and implicit requests from several team members that they not be required to work with plaintiff.

### Plaintiff's Complaint of Racial/National Origin Discrimination Against Ed Mauser

In September 2002, plaintiff made a complaint to human resources that his informal team lead, Mauser, was engaging in racial and national origin discrimination against plaintiff and other minorities in the WW & M group. Specifically, plaintiff claimed that Mauser was unfairly evaluating the performance of minorities on the team and that minorities were passed over for leadership opportunities on the team. Plaintiff also claims that, during a meeting between plaintiff, Mauser, and Paul O'Connell, O'Connell commented that foreigners don't want to be leaders, they just want to be doers and all they want to do is write code. Plaintiff asserts that Mauser shook his head in an agreeing fashion. Plaintiff claims that, a day or so after this occurred, he spoke with O'Connell regarding his comment and that O'Connell stated, "well it is like what Ed [Mauser] said, foreigners want to be doers and not followers." Mauser testified that he did not recall O'Connell using the word "foreigner" in the August 2002 meeting.

Plaintiff claimed that two other minority employees on the WW & M team, Vickram Ganesan and Manish Sohaney, also had discrimination complaints about Mauser. Both Plaintiff and Ganesan spoke with Livingston via telephone, at which time Livingston asked plaintiff to outline his concerns and forward them via email, which plaintiff did. Plaintiff's email complained

of unfair performance evaluations, biased statements with a slant regarding foreigners, missed leadership opportunities, and overall unfair evaluation of abilities and work performance.

Plaintiff took short-term disability (STD) leave from his job from September 25, 2002 to October 21, 2002. On September 26, 2002, Bernard sent an email to John Shannon and Brian Castle stating "I hate to say it but it looks like someone is trying to play the game." Castle felt like plaintiff was making this request on fraudulent grounds considering it was done in the middle of plaintiff making a discrimination complaint. Bernard also stated that she thought a second opinion should be obtained for plaintiff's STD.

Livingston investigated plaintiff's complaint against Mauser during plaintiff's leave. Livingston interviewed Ganesan and Sohaney, each of whom had concerns about purported biased decisions, a lack of equal opportunities, and favoritism on the part of Mauser. Livingston also interviewed Castle and Mauser. Castle informed Bernard of plaintiff's complaint.

### Return From STD

On October 21, 2002, plaintiff returned to work from STD leave. Plaintiff claims that the day he returned, Castle told plaintiff that he was very bothered that Harris called Ed Mauser a racist. Castle denies this, testifying that he did not tell plaintiff he was upset that plaintiff had reported Mauser to human resources. Castle admits telling plaintiff on a couple of occasions that he disagreed with plaintiff's discrimination allegations and encouraged plaintiff to look at the facts to get to the truth of the matter.

In any event, upon returning from short-term disability leave, plaintiff was assigned to the Voice Web II project. Plaintiff was assigned a senior developer role. Hyong Kim, an SE III, had been assigned as technical lead. Plaintiff complained that the Voice Web project work was inconsequential and that the work he was assigned was below his level.

Livingston, Castle and Mauser met with plaintiff on October 23, 2002, to discuss plaintiff's complaint against Mauser. Plaintiff complained of a pattern of cultural, physical and assignment segregation within the WW & M group. Plaintiff also expressed concern of retaliation for raising these types of issues to management and human resources.

On October 24, 2002, Castle sent an email to Bernard and Livingston summarizing the October 23, 2002 meeting. In that email, Castle stated that Livingston found no misconduct on Mauser's part and also told Bernard that Ganesan and Sohaney did not want to be involved and that they did not feel there were any racially orientated issues on the team. Castle stated that Mauser's record should be cleared of this episode due to the negative stigma associated with such a complaint. However, in Livingston's interviews with Ganesan and Sohaney, neither expressed any dissatisfaction with being included in her investigation.

Also on October 24, 2002, Castle asked plaintiff via email to report on the status of his work on the Voice Web II project. Plaintiff reported that he had done no consequential work on the project. That same day, Castle replied by email to plaintiff and Mauser, criticizing plaintiff for doing no consequential work for an entire week and informing plaintiff that he should make an effort to find work when he is not busy. Castle forwarded the email correspondence between Castle and plaintiff to Livingston, stating that plaintiff's failure to do work on the Voice Web II project was one of the reasons he wanted to put plaintiff on a PMP.

An issue raised by plaintiff in this set of correspondence was the fact that plaintiff

was working under Hyong, an SE III, and that plaintiff, an SE IV, had to report to Hyong. Mauser later testified that all the other SE IV employees were in leadership positions, or in positions where they were not reporting to a lower level SE, with the only exception being plaintiff, but that several of the SE IVs were reporting to and receiving assignments from other SE IVs.

On October 31, 2002, plaintiff emailed Livingston about the status of his September 19, 2002 complaint against Mauser. Livingston emailed plaintiff back and stated that there was no evidence of discriminatory behavior against minorities in the WW & M group. Livingston forwarded this conclusion to Castle.

### Defendant's Reduction in Force

In September 2002, Bernard was informed that her group, Application Development, would be affected by a series of upcoming reductions-in-force. Several members of Application Development were laid off in October 2002, but the WW & M team was not affected by the October layoffs. On October 18, 2002, Bernard informed Castle that WW & M would be affected by the upcoming November layoffs. Castle's group was to be reduced by 20 percent. Castle was instructed to use Sprint's realignment selection worksheets to rate the SE IVs and Vs on the WW & M group. Castle rated plaintiff as the poorest performer overall. Castle also used the realignment selection worksheets to rate the SE IIs and IIIs in the WW & M group, with Ramarao Bahara emerging as the poorest performer overall. In all, of the three worst-scoring employees on the realignment worksheets, two were Pacific–Islander and one was black. Of the three

employees with the best scores, one was Pacific–Islander and two were white.

According to the worksheets, Castle recommended that plaintiff and Bahara be included in the November 2002 reduction in force (November RIF). On or about November 1, 2002, Castle sent the completed realignment selection worksheets to Bernard, who reviewed the worksheets, and then sent them to human resources on November 2, 2002. Sprint's human resources and legal departments then reviewed the recommendations.

### Castle's Verbal Warning to Plaintiff

On November 15, 2002, Castle met with plaintiff to give him a third quarter evaluation. Defendant's performance reviews are facilitated by a self-evaluation document prepared by each employee called a LINK. Castle had instructed the WW & M team on the proper method of preparing the LINK review document. In Castle's opinion, plaintiff failed to follow his directions on how to prepare the document by including only third quarter data, rather than including all year-to-date content as Castle claims he had instructed. Plaintiff denies he prepared the LINK improperly. In any event, immediately following the LINK review meeting, Castle issued a verbal warning to plaintiff.[2] The verbal warning addressed plaintiff's performance on the LBS project, which Castle regarded as poor; criticism for plaintiff's doing no consequential work on the Voice Web II project; and criticism of plaintiff for accepting work assignments while objecting to their content. Plaintiff refused to sign the letter that documented the verbal warning because plaintiff believed the warning contradicted itself,[3] was inaccurate, and was based on retaliation.

---

2. The verbal warning is the first step in defendant's corrective action program.

3. The warning stated that plaintiff failed to show strong initiative beyond simply request-

ing work while at the same time accusing plaintiff of failing to contact management to request work.

On November 19, 2002, plaintiff filed a complaint with Sprint's Ethics Hotline. Plaintiff alleged that Castle was retaliating against him for taking short-term disability leave and for filing the September 2002 complaint against Mauser.

On November 21, 2002, plaintiff was informed that he would be included in the November RIF.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

Plaintiff asserts that defendant's decision to include him in the RIF was motivated, at least in part, by race. Plaintiff also claims that defendant selected him to be included in the RIF in retaliation for his complaints of discrimination.

■ The court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, in order to survive summary judgment, the plaintiff must first establish a prima facie case of discrimination or retaliation. If the plaintiff carries that burden, the defendant must then articulate a facially nondiscrimi-

natory reason for the challenged employment action. If the defendant makes such a showing, the burden reverts to the plaintiff to prove the proffered nondiscriminatory reason is pretextual. In the RIF context, courts typically consider three types of evidence to determine pretext: (1) evidence that the termination of the employee is inconsistent with the employer's criteria; (2) evidence that the employer's evaluation of the employee was falsified to cause termination; or (3) evidence that the RIF is more generally pretextual. *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1140 (10th Cir.2000).

 In the context of a RIF, a plaintiff alleging intentional discrimination must prove "(1) plaintiff was within the protected group; (2) plaintiff was doing satisfactory work; (3) plaintiff was discharged despite the adequacy of his work; and (4) there is some evidence that the employer intended to discriminate against the plaintiff in reaching its RIF decision." *Juarez v. ACS Gov't Solutions Group, Inc.,* 314 F.3d 1243, 1245–46 (10th Cir.2003). The fourth element can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race. *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1165 (10th Cir. 1998).

 To establish retaliation, plaintiff must show (1) that he engaged in a protected opposition to discrimination, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse employment action. *Wells v. Colo. Dep't of Transp.,* 325 F.3d 1205, 1212 (10th Cir.2003).

 The court first turns to plaintiff's claim of race discrimination. Defendant contends that plaintiff cannot establish a prima facie case because, defendant claims, plaintiff's work at the time of the RIF was not satisfactory. Defendant points to the fact that in early August 2002, Castle had assessed that plaintiff was performing in the bottom ten percent of the WW & M group and that Castle was disappointed in many aspects of plaintiff's performance, including his work on the LBS PowerPoint presentation, the Voice Web project and his LINK review document. In response, plaintiff points out that, prior to August 2002, plaintiff's performance reviews were good and that he had received on several occasions positive oral feedback from both Castle and Mauser. As such, the court concludes that there exists a genuine issue of fact regarding whether plaintiff was performing his job satisfactorily in November 2002.

 However, even assuming plaintiff could establish a prima facie case, plaintiff's race discrimination claim cannot survive summary judgment. Defendant proffers the RIF as its legitimate, nondiscriminatory reason for laying off plaintiff. The burden therefore reverts to plaintiff to point to evidence showing that defendant's proffered explanation is pretextual.

There is simply no evidence in the record suggesting that defendant's decision to include plaintiff in the November RIF was motivated, even in part, by plaintiff's race. Plaintiff also has failed to show that defendant could have retained him but chose to keep someone of a different race. However, while there exists no evidence that plaintiff's inclusion in the November RIF was a pretext for race discrimination, there is evidence sufficient to survive summary judgment on plaintiff's claim of retaliation.

There is no dispute that plaintiff engaged in protected activity and that plaintiff's inclusion in the November RIF was an adverse employment action. The court therefore turns to whether there exists a causal connection between the two.

Plaintiff contends that the temporal proximity between his complaints and his inclusion in the RIF is sufficient to establish a causal connection. The court agrees. Plaintiff made numerous complaints between May and October 2002, the last of which was a meeting on October 23, 2002, between plaintiff and management regarding plaintiff's discrimination complaints. That meeting occurred seven days before Castle selected plaintiff to be included in the RIF. The court therefore concludes that plaintiff has set forth a prima facie case. *Daneshvar v. Graphic Tech., Inc.*, 18 F.Supp.2d 1277, 1293 (D.Kan.1998) (six-week gap sufficient for jury to infer causal connection).

As previously stated, defendant proffers the RIF as its legitimate, nondiscriminatory reason for laying off plaintiff. Plaintiff must therefore produce evidence showing that defendant's proffered explanation is a pretext for retaliation. Viewing all reasonable inferences in favor of plaintiff, as this court must on summary judgment, the court concludes that plaintiff has met this burden.

There is evidence in the record of comments by Mauser and Castle regarding their discontent about plaintiff's discrimination complaints. There also is evidence that after plaintiff began making his complaints, his job responsibilities were altered[4] and Castle began criticizing plaintiff's job performance. For example, plaintiff's January 2002 review rated him as "fully meets expectations;" on April 15, 2002, Mauser complimented plaintiff on his work and communication skills; and in May 2002, Mauser gave plaintiff an oral quarterly performance review that was good. After plaintiff complained of discrimination, plaintiff's performance evaluations, both formal and informal, declined,

which in turn contributed to plaintiff's selection in the RIF. Such evidence supports plaintiff's claim that defendant's proffered reason for including him in the RIF is pretextual. Accordingly, the court denies defendant's motion for summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that plaintiff's Motion to Strike or Alternatively for Leave to File a Sur Reply (Doc. 28) is denied, and defendant's Motion for Summary Judgment (Doc. 24) is granted with respect to plaintiff's claim of race discrimination and denied with respect to plaintiff's claim of retaliation.

---

4. The court expresses no opinion as to whether these alterations in job responsibilities were themselves adverse employment actions. Rather, the court views such job alterations as evidence supporting plaintiff's claim that his inclusion in the RIF was retaliatory.