F I L E D
United States Court of Appeals
Tenth Circuit

JAN 8 2003

PATRICK FISHER
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FELIPE G. JUAREZ,

        Plaintiff - Appellee,

v.

ACS GOVERNMENT SOLUTIONS
GROUP, INC., and AFFILIATED
COMPUTER SERVICES, INC.,

        Defendants - Appellants.

No. 02-6069

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-00-1703-L)**

---

Robert G. Chadwick, Jr. (Jeff A. Taylor, Oklahoma City, Oklahoma, with him on
the briefs) of Chadwick, Taylor & Eisenbraun, Addison, Texas, for Defendants-
Appellants.

Raymond C. Durbin, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **McKAY** and **MURPHY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

This employment discrimination action stems from a reduction in force (RIF) in which Appellant terminated several employees including Appellee. As of May 25, 2000, Appellant ACS employed fifteen skill-level-sixteen computer operators at Fort Sill Army Base in Lawton, Oklahoma, pursuant to a contract with the United States. On May 25, 2000, the Chief of Support Division notified the ACS Group Manager, Mr. Odland, and the ACS Site Manager, Mr. Nesmith, that a total of nine positions would need to be eliminated by June 5, 2000. Five of these positions were classified as skill-level-sixteen computer operators.

To accomplish the RIF, Appellant used a spreadsheet compiled by the Human Resources Department with six merit-based categories: accuracy of documentation, ability to follow established procedures, communications/teamwork, reliability, timely completion of assignments, and attendance/tardiness. The ratings were based on the prior six months and did not consider any past performance reviews. Appellant claims that the data from the merit spreadsheet were the sole criteria used to determine which employees would be terminated. ACS states that the Group Manager made the final decisions based solely on the merit spreadsheet. However, Appellee presented evidence that the decision was made by a committee and that it was based on longevity and job performance.

Appellee also presented evidence that the original merit spreadsheet

provided by Human Resources had two additional categories, tenure and recent performance review score. ACS claimed that these two categories were only for information-review and tie-breaking purposes. There was conflicting evidence about whether a tie occurred. Finally, the final form contains a justification at the bottom, which was suggested by Human Resources, stating that all five computer operators selected for termination "were not self-starters." Aplt. App., Vol. II, at 342.

Appellee Felipe Juarez, a Hispanic computer operator, began working for ACS in October 1995. During his employment, ACS consistently gave him high scores in formal performance evaluations. He received ratings of mostly "outstanding" and "exceeds requirements" in evaluation categories. In his last comprehensive performance evaluation, his immediate supervisor specifically stated that "Mr. Juarez is a self starter." Aple. Supp. App., at 12.

On June 5, 2000, Messrs. Odland and Nesmith told Appellee that he was being terminated due to a layoff. Appellee presented evidence that ACS had retained non-Hispanic computer operators with less experience and tenure than Appellee and who had lower recent performance evaluations. Appellee also presented evidence that Mr. Nesmith had made derogatory remarks about Mexicans in the past.

A jury reached a verdict in favor of Appellee on his claims of race, color,

and national-origin discrimination under Title VII and awarded him $22,500 in back pay and $250,000 in punitive damages. Appellant filed a Motion for Judgment as a Matter of Law, New Trial and/or Remittitur. The district court denied the motion in its entirety.

The issues raised on appeal are: (1) whether the district court properly denied Appellant's JMOL Motion to overturn the jury verdict granting Appellee compensatory damages for his claim of intentional discrimination on the basis of race, color, or national origin, and (2) whether the district court properly denied Appellant's JMOL Motion to overturn the jury verdict granting Appellee punitive damages for his claim that Appellant acted with malice or reckless indifference under 42 U.S.C. § 1981a. We review *de novo* the district court's denial of a Rule 50 JMOL motion asking whether there is evidence upon which a jury could return a verdict in favor of the party opposing the motion. Fed. R. Civ. P. 50(a); Griffin v. Steeltek, Inc., 261 F.3d 1026, 1028 (10th Cir. 2001).

"A § 1981 or § 1982 plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him or her on the basis of race. . . . Such proof may come from either direct or indirect evidence." The Guides, Ltd. v. The Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1073 (10th Cir. 2002). At trial, Appellee proved a prima facie case of intentional discrimination. The required elements of a prima facie case of intentional race

discrimination involving an RIF are (1) a plaintiff was within the protected group, (2) plaintiff was doing satisfactory work, (3) plaintiff was discharged despite the adequacy of his work, and (4) there is some evidence that the employer intended to discriminate against the plaintiff in reaching its RIF decision. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998). The fourth element can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race. Id. at 1167. We note that the Supreme Court's decision in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), which underscored the significance of the prima facie inquiry not only to the initial determination regarding the employer's burden of production, but also to the ultimate determination of whether the evidence supports a finding of intentional discrimination did not undermine validity of the Beaird decision.

Appellee's evidence showed that he was a Hispanic, Mexican-American; that he was qualified for the position of computer operator and performed his job duties in a satisfactory manner; that he was terminated during a reduction in force; and that ACS retained other computer operators who were not Hispanic or Mexican-American and who had less experience, less tenure, and lower prior performance evaluations. Appellee introduced evidence that ACS retained two computer operators that were frequently tardy or absent and one that slept on the job. Appellee also introduced evidence that a retained computer operator was

drinking on the job.

Appellee also presented evidence at trial that the spreadsheet used to justify the RIF decision was inaccurate and did not contain the actual selection criteria. The jury heard contradictory evidence about whether or not there was a tie between certain employees selected for termination and about who made the decision to include Appellee in the RIF. Additionally, despite language on the spreadsheet that Appellee and others selected for termination were not self-starters, Appellee's most recent performance evaluation identified him as being a self-starter.

Appellee further presented evidence that Mr. Nesmith, ACS's Site Manager in charge of both operations and human resources at the facility where Appellee worked, had made derogatory remarks about Mexican employees shortly before the RIF. Although ACS argues that Mr. Nesmith had no role in the selection of Appellee for termination, Appellee presented sufficient evidence allowing the jury to reasonably infer that Mr. Nesmith actually did participate in the termination decision.

Based on the evidence presented by Appellee, the jury could determine that the shifting reasons given by ACS for Appellee's discharge were pretextual and that ACS's self-proclaimed merit spreadsheet, devised by its line management and Human Resources Department, was fraudulent and merely a sham used to justify

Appellee's termination.  Therefore, we hold that the evidence was sufficient to support the jury's findings that ACS intentionally discriminated against Appellee because of his race, color, and/or national origin.

We next turn to the issue of whether the district court correctly denied ACS's motion for judgment as a matter of law as to the $250,000 in punitive damages awarded to Appellee. "Whether sufficient evidence exists to support punitive damages is a question of law reviewed de novo." The Guides, 295 F.3d at 1077 (quoting Fitzgerald Mountain States Tel. & Tel. Co., 68 F.3d 1257, 1262 (10th Cir. 1995)).

Punitive damages are available under the Civil Rights Act of 1991, Title VII, if the plaintiff proves that an employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1) (1994).

> [The] standard for punitive damages cannot be satisfied by a showing of intentional discrimination alone.  Otherwise, every jury verdict in a successful § 1981 or § 1982 claim would include an award of punitive damages.  Instead, . . . a plaintiff must prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination.

The Guides, 295 F.3d at 1077; see also Kolstad v. American Dental Ass'n, 527 U.S. 526, 534 (1999) ("Congress plainly sought to impose two standards of liability–one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award.").  A

plaintiff must present evidence that the defendant intentionally discriminated against him on the basis of race with malice or "in the face of" a perceived risk that its actions would violate federal law. See Kolstad, 572 U.S. at 535-36 ("The employer must act with malice or with reckless indifference to the [plaintiff's] federally protected rights.").

Applying these standards, we hold that Appellee presented sufficient evidence that ACS terminated Appellee despite a recognized risk of violating Title VII. Appellee presented evidence that Mr. Nesmith and other supervisory employees had received some EEO training and that Mr. Nesmith was the Equal Employment Opportunity Officer at the Fort Sill site. In conjunction, Appellee presented evidence that could lead the jury to conclude that Mr. Nesmith was involved in the RIF decision.

In addition, Appellee presented evidence of cover-up after the discriminatory action. Appellee introduced evidence that the Human Resources Department actively participated with management-level employees to cover up the discriminatory discharge of Appellee by giving a false reason for his discharge. Even though cover-up after the fact does not necessarily import previous evil intent, in the instant case, the jury could infer that the cover-up was planned prior to the discriminatory discharge.

Based on the evidence presented, the jury could determine that the merit

spreadsheet was used merely in an attempt to justify the termination of certain individuals. Even though eight categories were supplied by Human Resources, ACS chose to use only six of those categories in rating employees. Aplt. App., Vol. II, at 200. The two categories supposedly not used in the RIF decision were tenure and past performance evaluation score. The jury could infer that these categories were intentionally excluded in an attempt to justify terminating Appellee.

Appellee also presented proof that ACS's Human Resources Department failed to provide more detailed instructions and guidelines in the RIF or to review and monitor the RIF selection process. The totality of the evidence allowed the jury to determine "that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination." The Guides, 295 F.3d at 1077.

For the foregoing reasons, the decision of the district court is **AFFIRMED**.