Darrell WALKER, Plaintiff,

v.

FAITH TECHNOLOGIES,
INC., Defendant.

No. 03–2358–JWL.

United States District Court,
D. Kansas.

Nov. 17, 2004.

**1264**

Steven D. Horak, Olathe, KS, for Plaintiff.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiff Darrell Walker filed suit against defendant alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. This matter is presently before the court on defendant's motion for summary judgment on plaintiff's claims (doc. # 36). As set forth in more detail below, the motion is granted in part and denied in part.

### I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. In 2001, plaintiff was working as a J–1 journeyman electrician for Encompass Electrical Technologies, Inc. ("EET–Midwest"). In September of that year, plaintiff was assigned to work on a job at a Target store. The project manager on the job was Toby Henson. Plaintiff worked at the Target store job for two weeks and, according to plaintiff, over the course of that two-week period Mr. Henson subjected plaintiff to a racially hostile work environment. Specifically, plaintiff alleges that Mr. Henson made inappropriate racial remarks about plaintiff, an African–American, including referring to plaintiff as a "coon" and stating that he did not want to work with "niggers." Plaintiff notified Re-

nee Weaver, EET–Midwest's Director of Human Resources, about Mr. Henson's behavior and Ms. Weaver responded by transferring plaintiff to another job site-a project at Costco.

The project manager on the Costco job was Patrick McKenna. While working with Mr. McKenna, plaintiff advised Mr. McKenna that Mr. Henson had made racial slurs in the workplace and in plaintiff's presence. Immediately after hearing this information, Mr. McKenna notified Ms. Weaver and Mike Jansen, the President of EET–Midwest, about his discussion with plaintiff and the work environment that plaintiff had experienced working with Mr. Henson. The record is unclear as to whether Ms. Weaver and/or Mr. Jansen responded in any way to the information that Mr. McKenna shared with them. In any event, plaintiff did not make any other internal complaints of harassment or discrimination during his employment with EET–Midwest.

In addition to his experience with Mr. Henson, plaintiff testified that he was subjected to racial slurs throughout his employment with EET–Midwest and that he was subjected to such comments on nearly a daily basis. According to plaintiff, Larry Briscoe, one of plaintiff's supervisors on numerous jobs, would frequently make comments such as "the only good nigger is a dead nigger." One of plaintiff's coworkers, Terence Lamb, averred that Mr. Briscoe frequently stated that he "did not want to work with niggers." Plaintiff further testified that he was frequently called a "coon," a "spook," and a "nigger" by both coworkers and members of management. Plaintiff also testified that racially charged comments, including references to "killing" all "niggers," were written on company property.

On November 4, 2002, plaintiff was laid off by EET–Midwest. According to EET–

Midwest, plaintiff was laid off because the company decided that it would not have enough work in the foreseeable future for everyone in the workforce. During this same time frame, EET–Midwest laid off six white journeymen. While on layoff, plaintiff, consistent with EET–Midwest's policy, consistently contacted Ms. Weaver to ascertain whether any jobs were available and whether he might be recalled or loaned out to another company. On November 13, 2002, while plaintiff was on layoff, defendant Faith Technologies, Inc. ("Faith") purchased the assets of EET–Midwest. Mike Jansen, the President of EET–Midwest, was one of seven original shareholders of Faith and he also served as the President of Faith. On November 19, 2002, EET–Midwest filed for bankruptcy and it is no longer in business.

EET–Midwest's layoff policy provided that any employee who was on layoff for eight consecutive weeks would be discharged. According to Faith, it adopted this policy when it purchased the assets of EET–Midwest and, consistent with this policy, Ms. Weaver (who became the Director of Human Resources for Faith), Mr. Jansen and other members of Faith's management team decided to discharge those employees who had been on layoff status at the time Faith purchased EET–Midwest's assets once those employees reached eight consecutive weeks of layoff. According to Ms. Weaver, this decision was made because there was not enough work for Faith to continue to employ those individuals. Thus, plaintiff's employment was terminated effective December 31, 2002. All six white journeymen who were on layoff at the same time that plaintiff was on layoff were ultimately terminated, too. Mr. McKenna avers that plaintiff was discharged on the basis of his race. Similarly, plaintiff's coworker, Mr. Lamb, as well as David Smith, a former manager at EET–Midwest, aver that plaintiff was placed on a "black list" for termination on the basis of his race.

Plaintiff filed suit against Faith asserting claims of racial harassment and discriminatory layoff on a theory of successor liability, as well as claims of discriminatory discharge and retaliation.

Additional facts will be provided as they relate to plaintiff's particular claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of

evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1); *see also Kaster v. Safeco Ins. Co. of Am.*, 82 Fed. Appx. 28, 30 (10th Cir. 2003) (affirming the district court's grant of summary judgment in favor of defendant in an ADEA case where the plaintiff had failed to present evidence sufficient for a reasonable jury to conclude that Safeco's employment decisions were age-related); *Young v. White*, 71 Fed.Appx. 819, 820 (10th Cir. 2003) (affirming district court's grant of summary judgment in favor of defendant in race discrimination and retaliation context).

## III. Successor Liability

Plaintiff's claims of racial harassment and discriminatory layoff are asserted under Title VII and 42 U.S.C. § 1981. To establish a prima facie case under Title VII, plaintiff must prove, among other things, that Faith was his employer. *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir.1998). The requirement is the same under section 1981 where, as here, the contractual relationship at issue is an employment relationship. *See Perry v. Woodward*, 199 F.3d 1126, 1133–34 (10th Cir.1999). It is undisputed, however, that Faith was not plaintiff's employer at the time plaintiff claims he was subjected to racial harassment and at the time of plaintiff's lay off. With respect to his racial harassment and discriminatory layoff claims, then, plaintiff seeks to hold Faith liable for the discriminatory acts of its predecessor under the theory of successor liability.[1] As explained below, the court finds that genuine issues of material fact exist with respect to whether Faith can be held liable as a successor with respect to

---

1. In his brief, plaintiff asserts that Faith can be held liable for racial harassment regardless of the application of successor liability because plaintiff was subjected to such harassment through the date of his termination in December 2001. In other words, plaintiff states that he was subjected to racial harassment during the time when he was actually employed by Faith. The court rejects this argument. It is undisputed that plaintiff was laid off on November 4, 2002–prior to the purchase of assets-and that he was not in the workplace at any time after that date. Any workplace harassment that plaintiff endured, then, necessarily ceased no later than November 4, 2002. Thus, Faith can be liable for alleged racial harassment only under the doctrine of successor liability.

plaintiff's racial harassment claim. The court, however, grants summary judgment in favor of Faith with respect to plaintiff's discriminatory layoff claim.

In *Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221 (10th Cir.1982), the Tenth Circuit considered a successor corporation's liability under Title VII for the discriminatory practices of its predecessor. The Circuit, endorsing the Sixth Circuit's decision in *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974), stated that successor liability in the Title VII context "must be determined upon the facts and circumstances of each case," and adopted the factors identified by the *MacMillan* court as relevant in determining whether to impose Title VII liability on a successor corporation. *See Trujillo*, 694 F.2d at 225. Those factors are as follows: Whether the successor company had notice of the charge; the ability of the predecessor to provide relief; whether there has been a substantial continuity of business operations; whether the new employer uses the same plant; whether it uses the same or substantially the same work force; whether it uses the same supervisory personnel; whether the same jobs exist under substantially the same working conditions; whether it uses the same machinery, equipment and methods of production; and whether it produces the same product. *See id.*

■ Over the years, courts have refined the *MacMillan* factors into a three-criteria test. *See, e.g., Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir.1986); *Jackson v. Lockie Corp.*, 108 F.Supp.2d 1164, 1167 (D.Colo.2000); *Coleman v. Keebler Co.*, 997 F.Supp. 1094, 1098–99 (N.D.Ind.1998). This test focuses on the first three factors identified by the *MacMillan* court-whether the successor corporation had prior notice of the claim against

the predecessor; whether the predecessor is able, or was able prior to the purchase, to provide the relief requested; and whether there has been a sufficient continuity in the business operations of the predecessor and successor. *See Jackson*, 108 F.Supp.2d at 1167 (citing cases). The remaining six factors identified in *MacMillan* provide a foundation for analyzing the third criterion-whether there is sufficient continuity of operations between the successor and predecessor to justify successor liability. *See id.* (citing cases).

Of the three criteria to be considered, the first two criteria-notice of the claim to the successor prior to the purchase of assets and the ability of the predecessor to provide the relief requested by the plaintiff-are the most important. *See id.* As the Seventh Circuit has explained, "[t]he first two factors identified in *MacMillan* are critical to the imposition of successor liability" because "it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *See Musikiwamba v. ESSI, Inc.*, 760 F.2d at 740, 750 (7th Cir.1985).

*A. Racial Harassment*

■ In its motion for summary judgment, Faith asserts that plaintiff cannot satisfy either of the first two "critical" factors for imposing successor liability with respect to plaintiff's racial harassment claim. According to defendant, Faith did not have notice of plaintiff's racial harassment claim prior to its purchase of EET–Midwest's assets and plaintiff could have obtained relief from EET–Midwest.[2] The court finds that genuine issues

---

2. With respect to the third factor for imposing

successor liability-continuity of business oper-

of fact exist concerning whether Faith had notice of plaintiff's racial harassment claim and whether plaintiff could have obtained relief from EET–Midwest. Summary judgment on this claim, then, is denied.[3]

### 1. Notice of Plaintiff's Claim

The evidence viewed in the light most favorable to plaintiff demonstrates that in October 2001 plaintiff complained to his project manager, Patrick McKenna, that he had been subjected to racial harassment at his previous assignment while working for Toby Henson. Mr. McKenna, in turn, advised Renee Weaver and Mike Jansen about plaintiff's complaints. Plaintiff himself also notified Ms. Weaver about the alleged harassment he endured while working under Toby Henson's supervision. While plaintiff was ultimately transferred from the assignment so that he no longer had to work with Mr. Henson, plaintiff testified that racial harassment was rampant on various jobs that he worked on and that "managers" often heard employees calling plaintiff racially derogatory names. In addition, plaintiff testified that Larry Briscoe, a member of management who supervised plaintiff on numerous jobs, frequently made comments such as "the only good nigger is a dead nigger." According to plaintiff, he was subjected to racial slurs in the workplace on nearly a daily basis.

Faith asserts that it had no notice of plaintiff's racial harassment claim. While Faith concedes for purposes of its motion that Mike Jansen had knowledge in October 2001 of plaintiff's complaint of harassment, Faith contends that there is no reason that Mr. Jansen should have known in November 2002 that a harassment claim from plaintiff was imminent or even possible, as plaintiff did not make any complaints of harassment at any time after October 2001. The court rejects Faith's argument and concludes that genuine issues of material fact exist concerning whether Faith had notice of plaintiff's racial harassment claim.

Significantly, Mike Jansen had knowledge of plaintiff's complaints. Mr. Jansen was the president of EET–Midwest and is a shareholder of Faith as well as the president of Faith's Kansas City division. Thus, Faith had knowledge of plaintiff's complaints. *See Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221, 223 (10th Cir.1982) (successor corporation had notice of pending EEOC complaint where one of the buyers of the successor corporation was the general manager of the predecessor corporation with knowledge of the complaint); *EEOC v. MTC Gear Corp.*, 595 F.Supp. 712, 717 (N.D.Ill.1984) (genuine issue of fact existed on notice issue where president of successor corporation was president of predecessor corporation at the time EEOC charges were filed).

Faith asserts that mere knowledge of "possible claims" or an employee's informal complaints to management (as opposed to imminent claims or actual charges) is insufficient to establish successor liability. However, the vast majority of cases relied upon by Faith in its motion suggest that knowledge of informal complaints, knowledge of possible claims and even knowledge of discriminatory acts would all be sufficient to impose successor liability. *See Jackson v. Lockie Corp.*, 108 F.Supp.2d 1164, 1168 (D.Colo.2000) (reject-

---

ations-Faith concedes that this factor cuts in favor of imposing successor liability because Faith has largely continued the business operations of EET–Midwest. Thus, the court need not examine this factor in analyzing Faith's motion for summary judgment.

3. Conceding that factual issues exist with respect to the merits of plaintiff's racial harassment claim, Faith has not moved for summary judgment on the merits of that claim. Thus, a trial is necessary on plaintiff's racial harassment claim.

ing theory of successor liability and holding that successor corporation had no notice of plaintiff's claims in part because plaintiff first advised her employer of her complaints after the purchase of assets); *Scott v. Sopris Imports Ltd.*, 962 F.Supp. 1356, 1359 (D.Colo.1997) (rejecting theory of successor liability and holding that successor corporation had no notice of plaintiff's claims in part because there was no evidence that management of successor corporation knew about harassment in workplace and noting that successor corporation had no notice of an "imminent or even possible claim" by plaintiff); *Spiers v. McNeil Real Estate Management, Inc.*, 1994 WL 476300, at *4 (D.Kan. Aug. 30, 1994) (declining to impose successor liability where the uncontroverted facts established that successor corporation had no notice of any alleged discriminatory acts at the time of the purchase agreement). Moreover, Faith directs the court to no cases (and the court's research has uncovered no cases) suggesting that successor liability may be imposed only if the successor corporation has knowledge of formal charges, a pending lawsuit or otherwise "imminent" claims.

Although plaintiff had not complained about racial harassment since October 2001, there is evidence that racial harassment continued to permeate the workplace such that Mr. Jansen knew or should have known that the discriminatory conduct had not ceased. Thus, a reasonable jury could conclude that it was entirely possible (if not likely) that plaintiff would file a claim

and that Mr. Jansen—and, thus, Faith—knew of that possibility. For these reasons, the court rejects Faith's argument that it did not have notice of a possible claim by plaintiff; a jury must decide whether Faith had such knowledge.

## 2. Ability of EET–Midwest to Provide Relief

Faith also contends that successor liability is inappropriate in this case because plaintiff could have obtained relief from EET–Midwest. According to Faith, it paid EET–Midwest millions of dollars for its assets and that payment is sufficient to demonstrate that EET–Midwest could have provided relief to plaintiff. *See Scott v. Sopris Imports Ltd.*, 962 F.Supp. 1356, 1360 (D.Colo.1997) (predecessor's receipt of $550,000 for assets was competent evidence of ability to pay triggering plaintiff's burden to come forward with evidence showing a genuine dispute concerning the ability to pay). As plaintiff highlights, however, EET–Midwest filed for bankruptcy in November 2002 and is no longer in business. The court agrees with plaintiff that this fact raises a genuine dispute about EET–Midwest's ability to provide relief. *See Brzozowski v. Correctional Physician Servs., Inc.*, 360 F.3d 173, 178 (3rd Cir.2004) (permitting plaintiff to file an amended complaint asserting successor liability against defendant where predecessor's "financial debacle" made it "unable to satisfy the plaintiff's monetary claims"); *EEOC v. MTC Gear Corp.*, 595 F.Supp. 712 (N.D.Ill.1984) (fact that predecessor company was no longer in business weighed against summary judgment).[4] In

**4.** Faith contends that plaintiff could have obtained relief through the bankruptcy court and, thus, should not be permitted to pursue his claim against Faith. For the reasons articulated by the district court in *Anderson v. J.A. Interior Applications, Inc.*, 1998 WL 708851, at *5–6 (N.D.Ill. Sept.28, 1998), the court rejects this argument. In a related argument, Faith relies on *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir.1985), for the

proposition that a claimant should not be made "better off" by the imposition of successor liability. This argument is based on the rationale that if plaintiff would not have recovered anything from the predecessor, then he should not be allowed to recover from the successor. *Id.* But, as recognized by the Seventh Circuit in a case decided after *Musikiwamba*, "a second chance is precisely the point of successor liability, and it is not clear

short, genuine issues of fact exist concerning EET–Midwest's ability to provide relief to plaintiff.

## B. Discriminatory Layoff

■ Faith also moves for summary judgment on plaintiff's discriminatory layoff claim on the grounds that plaintiff cannot establish successor liability, the only means of holding Faith liable as it is undisputed that plaintiff was laid off prior to Faith's purchase of EET–Midwest's assets. In response, plaintiff appears to concede that he cannot establish successor liability with respect to his discriminatory layoff claim as he addresses Faith's successor liability arguments only with respect to his racial harassment claim. In other words, plaintiff makes no arguments concerning Faith's liability for plaintiff's layoff. Indeed, the facts do not seem to suggest that Faith had any notice of any imminent or even possible claim by plaintiff concerning his layoff. Summary judgment on this claim, then, is granted in favor of Faith. *See Hinsdale v. City of Liberal, Kansas,* 19 Fed.Appx. 749, 768–69 (10th Cir. 2001) (affirming district court's conclusion that plaintiff had abandoned certain claims by failing to address those claims in response to the defendant's motion for summary judgment and concluding that the plaintiff's failure to respond was "fatal" to his claims).[5]

## IV. Plaintiff's Discriminatory Discharge Claim

Plaintiff asserts that Faith terminated his employment on the basis of his race. In its motion for summary judgment,

Faith, using the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), asserts that plaintiff cannot establish a prima facie case of discrimination and cannot show that Faith's articulated reason for terminating plaintiff's employment is pretextual. As an initial matter, plaintiff contends that he has come forward with direct evidence of discrimination, thus obviating the need for a *McDonnell Douglas* analysis. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (holding that the *McDonnell Douglas* framework does not apply once plaintiff has presented direct evidence of discrimination). Specifically, plaintiff asserts that Pat McKenna, one of Faith's project managers but not a decisionmaker in this case, testified that he attended a meeting in March 2002 and "it was clear from the meeting that Darryl Walker was being terminated because of his race." Plaintiff also points to a statement in Mr. McKenna's affidavit that Faith "wanted to get rid of" plaintiff "due to his race." Similarly, plaintiff highlights statements from Terence Lamb's affidavit to the effect that Faith keeps a "black list" of employees that it wants to terminate and that "Darryl Walker was placed on the black list due to his race." Mr. Lamb was one of plaintiff's coworkers.

■ None of the statements made by Mr. McKenna or Mr. Lamb constitutes direct evidence of discrimination. According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct

---

why an intervening bankruptcy proceeding, in particular, should have a per se preclusive effect on the creditor's chances." *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 51 (7th Cir.1995). The court, then, rejects this argument. *See Brzozowski,* 360 F.3d 173, 178–79 (3rd Cir.

2004) (rejecting application of *Musikiwamba* ).

**5.** Similarly, plaintiff does not respond to Faith's motion to the extent Faith moves for summary judgment on plaintiff's retaliation claims. For the same reasons, then, summary judgment on these claims is granted.

evidence when she presents proof of 'an existing policy which itself constitutes discrimination,'" *see Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136–37 (10th Cir. 2000) (citations omitted), or when she presents proof that the employer actually relied on a protected characteristic in making its employment decision (*i.e.*, a statement by a decisionmaker during the decisional process showing discriminatory animus), *see Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). The testimony of Mssrs. McKenna and Lamb does not reflect an existing policy of discrimination and does not reflect any statements by decisionmakers. Rather, the testimony reflects the personal opinions of Mssrs. McKenna and Lamb-opinions that were based on inferences drawn by Mssrs. McKenna and Lamb. By definition, then, such evidence is, at best, circumstantial. *See Stone*, 210 F.3d at 1136–37 (evidence is not direct evidence if it requires a trier of fact to infer discrimination); *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir.1999) (statements of personal opinion do not constitute direct evidence of discrimination).

### A. Plaintiff's Prima Facie Case of Discrimination

In the absence of direct evidence, plaintiff's discriminatory discharge claim is analyzed under the *McDonnell Douglas* framework.[6] Under this framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir.2000). To establish a prima facie case of discrimina-

tory discharge in the context of a reduction in force, plaintiff must show that he was in the protected class; he was doing satisfactory work; he was discharged despite the adequacy of his work; and there is some evidence that the employer intended to discriminate against him in reaching its RIF decision. *See Juarez v. ACS Government Solutions Group, Inc.*, 314 F.3d 1243, 1245–46 (10th Cir.2003) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998)). Faith concedes for purposes of its motion that plaintiff has satisfied the first three elements of his prima facie case. According to Faith, plaintiff cannot establish the fourth element.

■ Faith contends that plaintiff cannot establish an "intent to discriminate" for purposes of the fourth element because Faith terminated six white journeymen at the same time it terminated plaintiff's employment. In support of this argument, Faith relies on Judge Vratil's opinion in *Shikles v. Sprint/United Management Co.*, 2003 WL 22454012 (D.Kan. Oct.28, 2003). In *Shikles*, Judge Vratil concluded that the plaintiff had not established a prima facie case of age discrimination in the reduction in force context because the employer terminated several individuals who were younger than plaintiff and retained several individuals who were in the protected class. *See id.* at *13. Judge Vratil further noted that plaintiff could point to no evidence that the employer treated a younger employee more favorably than it treated him. *See id.*

*Shikles* is easily distinguished from the facts presented here. While Faith may have terminated several white journeymen during the same time frame when plain-

---

6. To the extent plaintiff's discriminatory discharge claim is asserted under section 1981, that claim is appropriately analyzed under *McDonnell Douglas* as well. *See Kendrick v.* *Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir.2000) (*McDonnell Douglas* applies to section 1981 employment discrimination claim).

tiff's employment was terminated, there is no evidence in the record concerning whether Faith retained any African–American employees who were similarly situated to plaintiff-*i.e.*, a J–1 journeyman. Faith has evidence that four African–American employees were retained in 2002, but these individuals were employed as a helper, an apprentice and a J–3 journeyman.[7] There is no evidence that helpers, apprentices or J–3 journeymen were even considered for the reduction. This evidence, then, is not nearly as compelling as the evidence before Judge Vratil. Moreover, unlike the situation in *Shikles,* it is undisputed that Faith retained white J–1 journeymen and, thus, treated nonminority journeymen more favorably than it treated plaintiff. No more is required to establish the fourth element of plaintiff's prima facie case. *See Juarez,* 314 F.3d at 1246 (fourth element can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race) (citing *Beaird,* 145 F.3d at 1167) (plaintiff who was fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element).

## B. Faith's Articulated Reason for Terminating Plaintiff's Employment

■ As plaintiff has set forth sufficient evidence to establish a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its decision. *See English v. Colorado Dep't of Corrections,* 248 F.3d 1002, 1008 (10th Cir.2001). According to Renee Weaver, Faith's Director of Human Resources, she, Mike Jansen and "other members of the Faith Technologies management team" decided that "Faith would discharge the employees who had

been on layoff status when Faith purchased EET–Midwest's assets when they reached eight consecutive weeks on layoff, because there was not sufficient work to employ those individuals." Faith has satisfied its "exceedingly light" burden to provide a nondiscriminatory reason for its decision. *See Goodwin v. General Motors Corp.,* 275 F.3d 1005, 1013 (10th Cir.2002).

## C. The Pretext Analysis

■ Plaintiff, then, may resist summary judgment only by presenting evidence that defendant's reason is pretextual (*i.e.,* unworthy of belief) or by otherwise introducing evidence of a discriminatory motive. *See Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir.2002) (citing *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1137 (10th Cir.2000)). Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997)). When assessing whether plaintiff has made an appropriate showing of pretext, the court considers the evidence as a whole. *Id.* (citation omitted).

As set forth below, the court concludes that plaintiff has come forward with evidence sufficient to survive defendant's motion for summary judgment. Specifically, the court concludes that the affidavits submitted by Mr. McKenna, Mr. Lamb and Mr. Smith (and, more specifically, the

---

**7.** Faith does not indicate the position of the fourth African–American employee it re- tained.

opinions contained therein) preclude summary judgment on plaintiff's discharge claim. Naturally, at trial plaintiff will be required to establish proper foundation for the opinions rendered by Mr. McKenna, Mr. Lamb and Mr. Smith and failure to do so could lead the court to grant a motion for judgment as a matter of law on this claim made by Faith at the close of plaintiff's evidence. Moreover, plaintiff's remaining arguments concerning pretext, as explained below, do not create a jury question on the reason for plaintiff's discharge; thus, plaintiff's ability to introduce such evidence at trial will be limited accordingly.

1. Affidavits of Mssrs. McKenna, Lamb and Smith

■ In response to Faith's motion for summary judgment, plaintiff has submitted affidavits from three former employees of Faith and/or Faith's predecessors, Patrick McKenna, Terence Lamb and David Smith.[8] Mr. McKenna was a project manager with Faith at the time of plaintiff's discharge and he had worked for Faith and Faith's predecessors for 6 years. Mr. Lamb was a J-3 journeyman who was discharged near the time of plaintiff's discharge and while his affidavit does not indicate the specific amount of time that he had worked for Faith and Faith's predecessors, it suggests that he had been employed at those entities for several years. Mr. Smith was a manager for approximately 4 years with Faith's predecessor. Mr. McKenna, Mr. Lamb and Mr. Smith each describe a pattern of discrimination against African-Americans at Faith and/or Faith's predecessors and offer their opinion that plaintiff's discharge was motivated by plaintiff's race.

■ Faith argues that the contents of the affidavits are inadmissible and, thus, cannot be considered in resolving the motion for summary judgment. See Fed. R.Civ.P. 56(e); *Pastran v. K–Mart Corp.,* 210 F.3d 1201, 1204 (10th Cir.2000) (for purposes of summary judgment, although evidence need not be in a form that would be admissible at trial, the content or substance of the evidence must be admissible). As the affidavits purport to offer opinion testimony as to the motivation for plaintiff's discharge, the admissibility of those affidavits is properly analyzed under Federal Rule of Evidence 701. Pursuant to Federal Rule of Evidence 701, the testimony of a lay witness "in the form of opinions or inferences" is admissible if those opinions or inferences "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Courts generally hold admissible under Rule 701 evidence in the form of lay opinion testimony in discrimination cases when given by a person whose position with the defendant entity provides the opportunity to personally observe and experience the defendant's policies and practices. See *Gossett v. Oklahoma ex rel. Board of Regents for Langston University,* 245 F.3d 1172, 1179 (10th Cir.2001).

In *Gossett,* the plaintiff, a male, filed a Title IX suit against the defendant, alleging that plaintiff's involuntary withdrawal from the defendant's nursing program was the result of gender discrimination. See *id.* at 1175. The district court granted summary judgment in favor of the defendant, concluding that plaintiff had failed to present sufficient evidence to raise a jury question on this claim. See *id.* In doing

---

8. To the extent the affiants were employed by Faith's predecessors, the observations and opinions of the affiants are still relevant to plaintiff's discharge claim. The evidence viewed in the light most favorable to plaintiff indicates that Faith's workforce-including its management-was nearly identical to EET–Midwest's workforce and that the policies and practices of the entity remained unchanged.

so, the district court rejected an affidavit presented by plaintiff from Deborah Guy, who taught at the nursing school for four years and served as a member of the Admissions Committee. *See id.* at 1178–79. In her affidavit, Ms. Guy opined, based on her observations and experiences while teaching at the nursing school, that the plaintiff's involuntary withdrawal from the nursing program was the result of gender discrimination. *See id.* at 1178. The district court concluded that the affidavit failed to establish that Ms. Guy's observations and opinions were based on personal knowledge. *See id.* at 1179.

The Tenth Circuit reversed the grant of summary judgment and, more specifically, concluded that Ms. Guy's affidavit contained evidence which was admissible under Federal Rule of Evidence 701 and that the district court abused its discretion in refusing to consider it. *See id.* at 1180. According to the Circuit, Ms. Guy's affidavit demonstrated that her position as an instructor in the nursing school and as a member of the Admissions Committee provided her with "opportunity to observe firsthand for several years the School's policies and practices with respect to its treatment of male students." *Id.* The Circuit further stated that Ms. Guy's opinion was "a means of conveying her impression based on what she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection." *Id.* Thus, the Circuit concluded that the affidavit was admissible. *See id.; accord Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911–12 (2d Cir.1997) (long-time employee was permitted to testify that he believed age discrimination was involved in the plaintiff's termination; the witness was "in a position to have acquired personal knowledge of the facts that formed the basis of his opinion" and "had established a solid foundation of his intimate involvement with [defendant's] operation and his opinion was thus based on observations

about [defendant's] decisionmaking process."); *Haun v. Ideal Indus., Inc.,* 81 F.3d 541, 548 (5th Cir.1996) (supervisor's statement that defendant was deliberately phasing-out older workers properly admitted as opinion of lay witness where supervisor testified that he had been told to "build a case" against an older worker; remarks had been made about his own age; defendant aggressively pushed older workers into early retirement; and a human resources official told him that the company president would not approve a particular candidate "because of his age").

 The court concludes that the affidavits of Mr. McKenna, Mr. Lamb and Mr. Smith are sufficient, under the standard articulated by the Tenth Circuit in *Gossett,* for plaintiff's claim to survive defendant's motion for summary judgment. The affidavits describe in some detail the affiants' observations and experiences while working for Faith and/or Faith's predecessors for several years. Without exception, the affidavits describe a workplace where various members of management openly voiced their objections to working with African–Americans, where racial harassment was tolerated and where African–Americans, including plaintiff, were treated less favorably than white employees in terms of job assignments and, ultimately, selection for layoff and discharge. In such circumstances, a jury could infer from the testimony of Mssrs. McKenna, Lamb and Smith, provided plaintiff lays the proper foundation at trial with respect to the witnesses' observations and opinions, that Faith discharged plaintiff based, at least in part, on plaintiff's race.

**2. Preferential Treatment of Mssrs. Holley and Heathman**

 Plaintiff contends that defendant's asserted reason for plaintiff's discharge is untrue on its face because Faith did not actually terminate all of the employees

who had been on layoff status once those employees reached the eight-week mark. According to plaintiff, two white journeymen who were on layoff status at the time Faith purchased the assets of EET–Midwest, Glenn Holley and John Heathman, were not discharged until late January 2003–several weeks past the eight-week mark. It is undisputed, however, that Mssrs. Holley and Heathman were ultimately terminated and that these individuals remained on layoff status through the time that they were terminated. Thus, while Mssrs. Holley and Heathman were treated differently than plaintiff in that they remained on layoff status for a few more weeks, this difference in treatment is trivial in light of the fact that they, like plaintiff, were discharged. Such evidence, then, does not permit an inference that plaintiff's race was a factor in Faith's decision. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (differences in treatment that are trivial or accidental will not sustain a claim of pretext).

### 3. Use of Subjective Criteria

■ Plaintiff next contends that Faith's articulated reason is pretextual because Faith used "subjective criteria" in determining which employees to recall from lay off. Faith's method of determining which employees to recall does not create a jury question on whether Faith terminated plaintiff's employment on the basis of plaintiff's race. As the Tenth Circuit has recognized, subjective factors often play a legitimate role in the hiring process and, thus, the use of such factors does not per se constitute discrimination.

*See Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1272 (10th Cir.1988); *accord Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir.1996) (use of subjective criteria does not suffice to prove intentional age discrimination). The use of subjective criteria can, however, "create a strong inference of discrimination if there is a showing of significant disparity in the representation of a particular group." *See Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir.1983). In the present case, there has been no showing of a significant disparity of representation. Moreover, the court notes that plaintiff has not shown or even argued that any particular subjective factor used by Faith was somehow adopted to camouflage racial bias or that any particular factor is stereotypical or otherwise indicative of race discrimination. The court, then, rejects this argument.

### 4. Procedural Irregularities

According to plaintiff, the evidence in the record is also sufficient to show pretext because Faith imposed an additional requirement on plaintiff that it did not impose on the other employees who were on layoff. Specifically, plaintiff contends that Ms. Weaver testified that plaintiff would have had to reapply for employment with Faith if he wanted to be recalled from layoff status while other employees were not required to reapply and were eligible for automatic recall if work became available. Assuming that this "failure-to-recall" claim and plaintiff's discriminatory discharge claim are two sides of the same coin (*i.e.*, Faith failed to recall plaintiff and instead discharged plaintiff on the basis of his race)[9] and, thus, that the argument is

---

**9.** Throughout his brief, plaintiff refers not only to Faith's decision to terminate his employment, but also to Faith's failure to recall, transfer or loan out plaintiff. It is not clear whether plaintiff considers these claims as independent from his discriminatory discharge claim and the pretrial order sheds

little light on plaintiff's intent. In plaintiff's "contentions" as set forth in the pretrial order, he states that he was subjected to "racial discrimination" in his employment and that he was treated less favorably than white employees. In other portions of the pretrial order, however, plaintiff refers specifically to

an appropriate one to make in the context of plaintiff's discriminatory discharge claim, the argument fails in any event as it is unsupported by the evidence in the record. As defendant points out, a full reading of Ms. Weaver's deposition indicates that plaintiff simply was not required to submit an application before he would be considered for recall.[10]

### 5. Hiring Additional Employees

Next, plaintiff asserts that defendant's assertion that a lack of work necessitated the termination of the employment of those individuals who were on layoff status at the time of the asset purchase is unworthy of belief because Faith, at the time plaintiff was on layoff status, ran an advertisement in the *Kansas City Star* seeking to hire employees in the "Com department."[11] Plaintiff testified that "if [he] remember[ed] the ad right," Faith was looking for "people with data experience." Plaintiff testified that he did not know if Faith was seeking journeymen, apprentices, laborers or some other position. In a related argument, plaintiff asserts that a member of Faith's management team told plaintiff near the time of his layoff that "there was work available" in the Com department.

Assuming plaintiff's testimony concerning these subjects is admissible,[12] it is not sufficient to cast doubt on Faith's proffered reason for plaintiff's discharge. Significantly, plaintiff has not come forward with evidence suggesting that Faith had work available for journeymen or that he was qualified for any of the work that was allegedly available. Moreover, he has not come forward with evidence that Faith actually hired any new employees for this available work as opposed to simply utilizing current employees for the work. In the absence of such evidence, no reasonable jury could conclude that Faith's assertion that it terminated those employees who had been on layoff status at the time of the asset purchase when they reached eight consecutive weeks on layoff because there was not sufficient work to employ those individuals is untrue.

### 6. Comments Made by Supervisors

■ Plaintiff contends that the comments made by Larry Briscoe are suffi-

---

discriminatory discharge and discriminatory layoff and does not refer specifically to discriminatory failure-to-transfer, failure-to-recall and/or failure-to-loan-out. In any event, the court construes these claims as subsumed in plaintiff's discriminatory discharge claim and not as separate claims as Faith discharged plaintiff instead of transferring, recalling or loaning out plaintiff. Stated another way, if Faith had transferred, recalled or loaned out plaintiff, then Faith would not have terminated plaintiff's employment. To the extent plaintiff feels aggrieved by the court's construction of these claims, he should file an appropriate motion. *See* D. Kan. Rule 7.3.

**10.** Similarly, plaintiff attempts to show pretext by arguing that Mike Jansen testified that Faith did not use performance rankings in connection with decisions concerning which employees were "available" and which em-

ployees would be laid off at the time plaintiff was placed on layoff status. According to plaintiff, other evidence in the record shows that rankings were noted next to employee names on layoff lists. Plaintiff contends, then, that the rankings "were a hoax" and were "made up" by Faith. Suffice it to say, the record does not support plaintiff's construction of Mr. Jansen's testimony and, thus, the inconsistency that plaintiff urges is not supported by the record.

**11.** Neither party has explained to the court the nature of the "Com department."

**12.** Faith contends that such testimony constitutes inadmissible hearsay but does not explain the nature of its objection. In fact, both the advertisement and the statements of Mr. Shultz would appear to be nonhearsay pursuant to Federal Rule of Evidence 801(d)(2) as admissions of party-opponents.

cient evidence from which a jury could infer that plaintiff's discharge was motivated by his race. He also highlights evidence that another supervisor, Roger Wilson, frequently made racial slurs in the workplace, including statements such as "everyone should own one," referring to African–Americans. Assuming Mssrs. Briscoe and Wilson made such comments, they are highly reprehensible. The comments do not, however, create a jury question under established Tenth Circuit precedent, precedent that requires plaintiff to show some nexus between the discriminatory statements and the employment decision. *See Stover v. Martinez,* 382 F.3d 1064, 1077–78 (10th Cir.2004); *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1209–10 (10th Cir.1999). To demonstrate a sufficient nexus, the plaintiff must show that the allegedly discriminatory comments were directed at the plaintiff, his position, or the defendant's policy which resulted in the adverse action taken against the plaintiff. *Stover,* 382 F.3d at 1078 (citing *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1457 (10th Cir.1994)). Plaintiff has not demonstrated the requisite nexus between the comments made by Mssrs. Briscoe and Wilson and Faith's decision to terminate plaintiff's employment.

██ Assuming that Mssrs. Briscoe and Wilson bore a discriminatory animus against plaintiff, there is simply no evidence in the record that either of these individuals were involved in the decision to terminate plaintiff's employment. There is no evidence that Mr. Briscoe or Mr. Wilson *recommended or in any way influenced the termination of plaintiff specifically or recommended that Faith terminate all employees on layoff status.* There is no evidence that Ms. Weaver, Mr. Jansen or any of the other individuals involved in the decision turned to Mr. Briscoe or Mr. Wilson for input on what to do with the individuals on layoff status. Thus, in the context of this case, the race-related comments made by Mssrs. Briscoe and Wilson, both non-decisionmakers, are not material in showing that Faith's decision was based on race. *See Minshall v. McGraw Hill Broadcasting Co.,* 323 F.3d 1273, 1287 (10th Cir.2003) (age-related comments made by non-decisionmakers are not material in showing that the defendant's action was based on age discrimination); *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994) (isolated comments insufficient to show discrimination where speaker was not involved in making allegedly discriminatory decision).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. #36) is granted in part and denied in part.

**IT IS FURTHER ORDERED BY THE COURT THAT** trial to the jury will commence at 9:30 a.m. on Tuesday, January 4, 2005. The court will conduct a limine conference on Monday, January 3, 2005 at 10:30a.m. and will issue a separate order concerning various pretrial deadlines.

**IT IS SO ORDERED.**