**Gail M. SMITH, Appellant,**

v.

**AQUILA, INC., Respondent.**

**No. WD 67273.**

Missouri Court of Appeals,
Western District.

April 24, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 29, 2007.

Application for Transfer Denied
Aug. 21, 2007.

Bert S. Braud, Kansas City, MO, for Appellant.

Jeffrey D. Hanslick, Kansas City, MO, for Respondent.

Before ROBERT G. ULRICH, P.J., THOMAS H. NEWTON, J., and GENE R. MARTIN, Sp. J.

ROBERT G. ULRICH, Presiding Judge.

Gail Smith appeals the judgment of the Jackson County Circuit Court. The court granted Aquila, Inc. (Aquila) summary judgment on Ms. Smith's claim that her termination from employment was the result of racial discrimination. In her sole point on appeal, Ms. Smith claims the summary judgment was error because whether her termination was based on her race was a genuine issue of material fact. The point is granted, and the judgment is reversed.

## Facts

Ms. Smith began working for Aquila in 1996. Ms. Smith was notified in May 2002 that her job was being eliminated, and she would be terminated from employment with Aquila. On October 7, 2002, Ms. Smith filed a charge of race discrimination with the Missouri Commission on Human Rights (MCHR). The MCHR issued her "Right to Sue" letter on August 14, 2003. Ms. Smith filed a petition in Jackson County Circuit Court alleging race discrimination and retaliation pursuant to the Missouri Human Rights Act (MHRA) on September 4, 2003.[1] In her petition, Ms. Smith alleged her termination was the result of racial discrimination. She sought compensatory and punitive damages.

---

1. "In accordance with § 213.075.3, when a MHRA complaint is filed, the MCHR executive director is required to 'promptly investi- gate' to determine whether probable cause exists for 'crediting' the complaint's allegations." *Pub. Sch. Ret. Sys. of Sch. Dist. of*

Aquila filed a motion for summary judgment.[2] Ms. Smith filed a memorandum in opposition to the motion for summary judgment, and Aquila subsequently filed a reply to Ms. Smith's opposition. The motion was sustained, and judgment was entered in favor of Aquila.[3] Ms. Smith's appeal followed.

Further facts are set forth below as necessary.

## Standard of Review

■■■ "The standard of review on appeal regarding summary judgment is essentially de novo." *Hayes v. Show Me Believers, Inc.*, 192 S.W.3d 706, 707 (Mo. banc 2006)(*citing ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). "Summary judgment will be upheld on appeal if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." *Id.*

■■■ "When considering an appeal from a summary judgment, [reviewing authority uses] the same principles employed by the trial court in determining whether to grant summary judgment." *Wehmeyer*

---

*Kansas City v. Mo. Comm'n on Human Rights*, 188 S.W.3d 35, 43 (Mo.App. W.D.2006). "Pursuant to the MHRA, § 213.111.1, a MHRA suit may be brought in the circuit court upon the issuance of a right-to-sue letter, a.k.a. a 'probable cause letter.' " *Id.*

Once a right-to-sue letter has issued, all proceedings before the MCHR concerning a complaint are terminated.

Although not jurisdictional, a right-to-sue letter is a prerequisite to the filing of a MHRA claim in state court. The purpose of requiring the issuance of the letter, prior to being allowed to file a MHRA claim in state court, is to afford the MCHR an opportunity to determine the validity of the complaint by investigating the complaint, to determine whether there is probable cause to believe that discrimination has occurred, and to hold a hearing. As noted, however, by the Missouri Supreme Court in *Igoe*, [152 S.W.3d 284 (2005)] pursuant to § 213.111, the MCHR may elect not to pursue a complaint and terminate its proceedings by issuing a right-to-sue letter. "This can be done *sua sponte* at any time within the statute of limitations period, *without completing the investigation.*" As the Court has recognized, the "right-to-sue letter to terminate administrative proceedings conserves the commission's resources, because termination by a finding of no probable cause requires an investigation and is subject to judicial review."

*Id.* at 44 (citations omitted).

**2.** Ms. Smith also alleged in her petition that Aquila refused to reimburse her for a business trip and failed to consider her for an open position in retaliation for her charge of racial discrimination. In its motion for summary judgment, Aquila sought judgment on the claim of racial discrimination and on the claim of retaliation. On appeal, Aquila asserts the grant of summary judgment was proper as to both the racial discrimination claim and the retaliation claim. In her reply brief, Ms. Smith states: "The 'retaliation' claim never existed. Smith made that clear to the court and opposing counsel below.... The evidence of events that occurred after Smith's termination is offered simply as further indicia of the racial animus. Smith never asserted a retaliation claim...." Either: (1) a retaliation claim was never asserted and, accordingly, the summary judgment pertained solely to the racial discrimination claim, or (2) a retaliation claim was asserted, Aquila was granted summary judgment on the claim, and Ms. Smith is not contesting that determination on appeal. In either case, this court need not and will not address any retaliation claim that may or may not have been asserted and disposed of via summary judgment.

**3.** On December 29, 2005, the circuit court entered an "Order" granting Aquila's motion for summary judgment. Ms. Smith appealed the order. Her appeal was dismissed after this court determined the order was not appealable pursuant to section 512.020, RSMo 2000, and Rule 74.01(a) in that it was not denominated "judgment." The circuit court entered "Summary Judgment" on June 29, 2006, sustaining Aquila's motion for summary judgment. Ms. Smith's current appeal is from that judgment.

*v. FAG Bearings Corp.*, 190 S.W.3d 643, 648 (Mo.App. S.D.2006). If the movant is a defending party:

> a *prima facie* case for summary judgment can be established by employing one or more of three means: (1) showing undisputed facts that negate any one of the plaintiff's required proof elements; (2) showing that the plaintiff, after an adequate period of discovery, has not produced and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of one or more of the plaintiff's proof elements; or (3) showing that there is no genuine dispute as to the existence of the facts necessary to prove the movant's properly pleaded affirmative defense. Regardless of which of these three means is employed by the defending party, each establishes a right to judgment as a matter of law.

*Pub. Sch. Ret. Sys. of Sch. Dist. of Kansas City v. Mo. Comm'n on Human Rights*, 188 S.W.3d 35, 40 (Mo.App. W.D.2006).

> Once movant has met this burden, the non-moving party may only avoid summary judgment being entered against her if she can "show-by affidavit, depositions, answers to interrogatories, or admissions on file-that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed."

*Wehmeyer*, 190 S.W.3d at 648 (citation omitted).

■ The record is viewed in the light most favorable to the non-movant. *Id.* "All facts set forth by affidavit or otherwise in support of summary judgment are taken as true unless contradicted by the non-movant's response." *Id.* The non-movant is accorded the benefit of all reasonable inferences from the record. *Pub.*

*Sch. Ret. Sys. of Sch. Dist. of Kansas City*, 188 S.W.3d at 39.

■ "A 'genuine issue' exists where the record contains competent evidence of 'two plausible, but contradictory, accounts of the essential facts.'" *Id.* at 40 (citation omitted). "'A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous.'" *Id.* (citation omitted). "In the absence of a genuine dispute as to one or more material facts, summary judgment is proper." *Thompson v. W.-S. Life Assurance Co.*, 82 S.W.3d 203, 206 (Mo.App. E.D.2002).

> With respect to [a] ... discrimination case, the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive or whether there is evidence, either circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.

*West v. Conopco Corp.*, 974 S.W.2d 554, 556 (Mo.App. W.D.1998) (citations and quote marks omitted).

### Statutory Framework

■ Ms. Smith brought her complaint under the Missouri Human Rights Act (MHRA), section 213.010 *et seq.* The MHRA was enacted by the Missouri General Assembly, *inter alia*, "[t]o ... eliminate and prevent discrimination because of race, color, religion, national origin, ancestry, sex, age as it relates to employment, [or] disability." § 213.030.1(1) [4]; *Pub. Sch. Ret. Sys. of Sch. Dist. of Kansas City*, 188 S.W.3d at 37–38. In deciding cases brought under the MHRA, courts "are guided not only by Missouri law, but also

---

4. All statutory citations are to RSMo 2000 unless otherwise stated.

by applicable federal employment discrimination decisions." *Thompson,* 82 S.W.3d at 206.

[P]ursuant to the Missouri Supreme Court's decision in *Midstate Oil Co., Inc. v. Missouri Com'n on Human Rights,* 679 S.W.2d 842, 845–46 (Mo. banc 1984), Missouri courts must evaluate claims arising under the [MHRA] according to the methodology established by the U.S. Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the methodology established in *McDonnell Douglas,* courts hearing claims arising under Title VII of the Civil Rights Act of 1964 use the following "burden shifting" analysis: (1) the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination; (2) if the plaintiff carries this burden, then the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its conduct; and (3) if the employer satisfies this burden, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's articulated reasons are pretextual.

Finally, in order for an employee to make out a prima facie case for employment discrimination in the absence of direct or circumstantial proof, the employee must establish the following four elements: (1) that the employee is a member of a protected group; (2) that the employee met the legitimate expectations of his or her employer; (3) that the employee suffered an adverse action; and (4) that circumstances exist which give rise to an inference of discrimination. Furthermore, many federal courts recognize that the proof required to establish a prima facie case varies in different factual situations.

*Young v. Am. Airlines, Inc.,* 182 S.W.3d 647, 652–53 (Mo.App. E.D.2005) (citations omitted). "[T]he fourth element of a plaintiff's prima facie case may be established with evidence of actions by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on an illegal discriminatory criterion." *Id.* at 653 (quote marks and citations omitted). " 'The pivotal issue in any claim of unlawful discrimination is whether the employer's conduct challenged by the plaintiff was motivated by an invidious purpose or whether it was based on a legitimate and rational consideration.' " *West,* 974 S.W.2d at 556 (citation omitted).

■■■ Observing that reduction of the workforce by businesses is not uncommon to reduce costs and increase profitability, the Second Circuit stated that "[e]conomic decisions of that sort are, of course, outside a court's purview. But sometimes the validity of a company's legitimate reduction masks, in an individual case, a discriminatory animus." *Id.* at 557 (*quoting Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1221 (2nd Cir.1994)). "In reduction in force terminations, it is not sufficient that an otherwise competent employee proves that he was terminated in order to establish a *prima facie* case." *Id.* "In order to establish a *prima facie* case in a reduction in force termination claim, a plaintiff must 'produce some additional evidence that a prohibited criterion . . . was a factor in [the plaintiff's] termination.' " *Id.*

## Analysis

In her sole point on appeal, Ms. Smith argues the trial court erred in granting Aquila's motion for summary judgment. She states that a reasonable jury could conclude from the evidence that the true reason for her termination was her race,

and, therefore, Aquila is not entitled to summary judgment as a matter of law. Rule 74.04(c)(6). Thus, she concludes the grant of summary judgment was improper.

### Aquila's Assertion of Material Facts

In its statement of uncontradicted material facts in its motion for summary judgment, Aquila asserted the following. Ms. Smith began working for Aquila in 1996 as a Corporate Contract Negotiator in Corporate Procurement. In July 2000, she sought and received a promotion into a Senior Human Resources Representative position in Aquila's Global Networks Human Resources Group (HR Group). The Senior Human Resources Representative position into which Ms. Smith was promoted was a higher level position and not an entry-level position. At the time of her promotion, Ms. Smith did not have any human resources experience and lacked many of the qualifications required for the position.

Ms. Smith was hired into the HR Group position by Larry McDonald. Victoria Heider both preceded and succeeded Mr. McDonald as the head of the HR Group. When acting as head of the HR Group, Mr. McDonald and Ms. Heider reported to Leo Morton, an African–American.

Mr. Morton approved Ms. Smith's promotion into the HR Group because, at the time, Aquila's business was thriving, and he believed Aquila had both the time and the resources available to develop a current employee interested in HR. Aquila recognized that Ms. Smith lacked human resources experience and would be in a "developmental" status as she gained experience.

Ms. Heider would not have hired Ms. Smith into a Senior Human Resources Representative position in the HR Group because she lacked human resources experience. Ms. Heider met individually with all the employees, including Ms. Smith, when she replaced Mr. McDonald as head of the HR Group. She informed Ms. Smith that she thought Ms. McDonald had done her a disservice by hiring her into a higher level human resources position without human resources experience and advised Ms. Smith that she had a "steep learning curve" in the position.

After meeting with Ms. Heider, Ms. Smith spoke with Mr. Morton about her concerns that she could not succeed if Ms. Heider were the head of the HR Group. Ms. Smith did not complain about race discrimination to Mr. Morton, however. Mr. Morton subsequently met with Ms. Heider, who confirmed that, although she would not have hired Ms. Smith, she was committed to helping Ms. Smith develop into a successful Senior Human Resources Representative.

As a part of her commitment to helping Ms. Smith succeed, Ms. Heider did several things. In the course of an overall HR Group re-alignment, she reassigned Ms. Smith from supporting the Retail Services Center to supporting the Call Center, which would expose Ms. Smith to more routine, day-to-day human resources issues. Ms. Heider also assigned a seasoned human resources professional, Glenda Hammond, to mentor Ms. Smith and assist in her development. When Ms. Heider realized Ms. Smith required more day-to-day supervision than she could provide, she assigned Ms. Hammond to supervise Ms. Smith directly.

Throughout the time that Ms. Smith reported to them, Ms. Heider and Ms. Hammond believed Ms. Smith was in a "developmental" position in the HR Group. Ms. Smith was the only Senior Human Resources Representative in a developmental position during this time. Ms. Hammond did "everything she could in her

power" to support Ms. Smith's development in human resources.

Based on her experience mentoring and supervising Ms. Smith, Ms. Hammond rated her 2001 performance as "marginal." Ms. Heider agreed Ms. Smith's performance in 2001 was "marginal." Aquila holds "calibration" meetings to ensure consistency across departments. During those meetings, supervisors defend how they have rated employees to ensure that any particular supervisor is not over-rating his or her direct reports. At a calibration meeting, Ms. Smith's peers agreed her performance in 2001 was "marginal." At Aquila, a "marginal" rating is consistent with a developmental position. Ms. Smith's "marginal" rating did not place her job in jeopardy as Aquila believed it reflected her developmental position.

In May 2002, Ms. Heider learned she had to reduce the number of employees in the HR Group by three. This reduction was part of a larger, broader reduction at Aquila. Ms. Heider recommended that Aquila terminate a male (Caucasian), a female (Caucasian), and Ms. Smith, (African–American female). All three of these employees had received a "marginal" rating for their 2001 performance.

Ms. Heider recommended Ms. Smith be included in the reduction because she was the only human resources generalist in the HR Group in a developmental position, and, as a result of the reduction, she could not afford to maintain an employee who could not function independently and without supervision. Mr. Morton approved Ms. Smith's inclusion in the reduction for the same reasons.

Ms. Smith was the least experienced of all employees who reported to Ms. Heider in the HR Group. Further, Ms. Smith cannot identify any HR Group employee whom she believes Aquila ought to have terminated in the reduction instead of her.

But for the May 2002 reduction in forces, Ms. Smith's job was not in jeopardy. In addition to the three employees terminated with the "marginal" performance rating, Ms. Heider terminated a Caucasian female for non-performance during the time Ms. Smith reported to her.

Ms. Smith did not believe she was being discriminated against while working at Aquila. It was only after she was terminated and began to review past events that she came to the conclusion she had been the victim of racial discrimination.

### Ms. Smith's Response to Aquila's Asserted Facts

In her memorandum in opposition to the motion for summary judgment, Ms. Smith disputed most of Aquila's asserted facts. She claimed the following. When she was promoted into a Senior Human Resources Representative position, it was in the United Energy Delivery (UED) group. Subsequently, the network groups were consolidated as the Global Networks group.

The human resources position Ms. Smith assumed was not a higher level position. It was the same position held by all the other human resource representatives in her department. They all shared the title of Senior Human Resources Representative. The titles for all the human resource employees in the HR Group were changed from Human Resources Representative to Senior Human Resources Representative. This was not a function change; it was a titling change.

Ms. Smith did have human resources experience. The exact qualifications for the position of Senior Human Resources Representative were never articulated to her. Neither was she informed which qualifications she lacked. Nonetheless, she had employee relations experience. Ms. Smith holds a bachelor's degree in

administration of justice and a bachelor's degree in business administration, which are related to human resources. She also holds a master's degree in marketing.

Ms. Smith was interviewed by Mr. McDonald and Bob Browning when she sought the position in the HR Group. Both Mr. McDonald and Mr. Browning told Ms. Smith they believed she had transferable skills. They were looking for someone who did not "grow up" in human resources; someone with energy and enthusiasm that could engage and inspire people. Mr. McDonald's goal was to make sure the person hired could support the marketing department and had an understanding of marketing. Mr. Morton endorsed the decision to hire Ms. Smith. Mr. Morton, the Senior Vice President and Chief Administrative Officer over Human Resources, did not have a human resources background or formal education in human resources. Aquila has conceded that whether Ms. Smith was qualified for the position of Senior Human Resources Representative is a triable issue and that sufficient evidence exists to permit the trier of fact to determine whether she was qualified for the position.

After returning as head of the HR Group, Ms. Heider met individually with all her employees. She met with Ms. Smith in July or August 2001 and informed Ms. Smith that Mr. McDonald had done her a disservice by hiring her into human resources without human resources experience. Ms. Heider further advised Ms. Smith that she had a "steep learning curve." When told by Ms. Heider that she had a "steep learning curve," Ms. Smith asked her what she needed to do or what area she needed to improve. Ms. Heider's response was "all areas." Ms. Heider gave Ms. Smith no direction.

Ms. Smith subsequently met with Mr. Morton at least twice. These meetings were not about Ms. Smith's concern that she would be unable to succeed under Ms. Heider. Instead, these meetings pertained to Ms. Smith's belief that Ms. Heider was not treating her fairly and she was in a hostile work environment. Ms. Heider was aware Ms. Smith spoke with Mr. Morton. Mr. Morton told Ms. Smith that "we have to work harder" and suggested that she prepare her own development plan to take to Ms. Heider for approval. Ms. Smith understood Mr. Morton to be telling her that African–Americans have to work harder than Caucasians in the environment at Aquila.

Mr. Morton acknowledged that when Ms. Heider had Ms. Smith report to Ms. Hammond, another Senior Human Resources Representative, it was reasonable for Ms. Smith to feel as through she was demoted. The only complaints from customers regarding Ms. Smith were relayed to Mr. Morton by Ms. Heider. Mr. Morton never received any customer complaints about Ms. Smith directly from customers. Ms. Hammond worked with Ms. Smith and did not have any complaints about Ms. Smith's performance.

Once Ms. Heider returned as head of the HR Group, she moved Ms. Smith to the Raytown Call Center. Ms. Heider then moved Ms. Smith from the seventh floor, where she had been working next to the retail service center, to the fourth floor, where storage was kept. Ms. Smith believed Ms. Heider moved her in an attempt to demean her and "take [her] down a notch."

Ms. Hammond was formally assigned by Ms. Heider to be Ms. Smith's mentor in June 2001. Yet, as early as May 2001, Ms. Hammond began keeping notes on Ms. Smith and her work in a "supervisor's file." When Ms. Heider assigned Ms. Hammond to be Ms. Smith's supervisor in November 2001, she did not request that

Ms. Hammond document anything. Despite no request for documentation, the supervisor's file grew to nearly 400 pages in approximately a year. It included emails with subject lines of "Gail documentation" and "an example on Gail." [5]

When Ms. Smith would call Ms. Heider with a question, Ms. Heider would tell her to ask Ms. Hammond. Ms. Heider would not allow Ms. Smith to work on projects for which Ms. Smith volunteered. Ms. Heider never visited Ms. Smith at the Call Center to lend support as she often did with other Senior Human Resources Representatives. When Ms. Smith requested administrative support on a large project, Ms. Smith did not provide the support. Ms. Heider referenced old forms Ms. Smith should use in her job that Ms. Heider and her subordinates created in 1995; Ms. Smith requested copies of these forms several times but was not provided them until just prior to her termination. Ms. Smith was not included in meetings involving her customers. Eventually, Ms. Heider had Ms. Smith report directly to Ms. Hammond, her peer.

Ms. Smith was not in a "developmental" position. Ms. Heider and Ms. Hammond stated they believed she was in a developmental position. However, Ms. Smith claims she was never given the opportunity for employment beyond a developmental stage because of the perceived animosity Ms. Heider had toward Ms. Smith, which she claimed began before Ms. Heider returned as the head of the HR Group. If she was in a developmental position, she was not the only Senior Human Resources Representative in such a position. At least two other employees who were either new to Aquila or learning about human resources occupied developmental positions as Senior Human Resources Representatives.

When Ms. Smith worked under Mr. McDonald's authority, he rated her performance as "meets" expectations for the last part of 2000. A "meets" expectations rating is a good rating. When Ms. Smith was rated "marginal" in 2001, she was not placed on a plan to improve her performance as was company policy when an employee's performance rating decreased. Ms. Hammond received feedback regarding Ms. Smith's performance from Ms. Heider before Ms. Hammond completed Ms. Smith's performance evaluation. Further, Ms. Heider had already ranked Ms. Smith's performance as "marginal" more than two weeks before the evaluation was given to Ms. Smith. Ms. Hammond had not complained to Ms. Heider about Ms. Smith and did not identify criticisms or complaints about Ms. Smith in her monthly reports to Ms. Heider. Following the formal evaluation, Ms. Heider rated all of her employees, including Ms. Smith, using a scale she created. This "Heider Scale" was not in Aquila's policies and procedures or any other Aquila document. The "Heider Scale" was comprised of six categories: loyalty, skills, dedication, leadership, big picture, and growth potential. The "Heider Scale" is not a normal part of Aquila's evaluation process and has not been used by other supervisors. Ms. Smith was never informed that she would be evaluated on the "Heider Scale" and was not aware of the categories listed in the scale.

Both Mr. Morton and Ms. Hammond believe that an employee should be evaluated, as much as possible, on objective standards rather than subjective ones. Employees should know what is expected of them and how their performance will be evaluated, they believe. Aquila has a form that is utilized by supervisors when evalu-

---

5. Ms. Smith's first name is Gail.

ating employees. Mr. Morton stated that if a supervisor were to use some type of grading scale other than the company's, he would expect that the supervisor would have communicated her expectations to the employee. Mr. Morton further stated that Aquila encourages supervisors to document the performance of the people they supervise. One form of documentation is the formal annual review, which should be truthful and accurate and should include input received from persons other than the employee's supervisor. If an employee is being mentored, that should be documented. Ms. Heider was the only supervisor utilizing the "Heider Scale." Mr. Morton was unfamiliar with the "Heider Scale" and did not know whether it included any specific measures. He further acknowledged that the categories in the "Heider Scale" were subjective. Ms. Hammond never recommended that Ms. Smith be terminated because she did not consider Ms. Smith's performance to be so sub-par as to warrant termination.

Company policy provided that the functional heads within a department gather at calibration meetings to "talk about the rating given by the supervisor and agree upon it and also make sure that it was calibrated." The calibration meetings ensured people were rated by a standard definition. Ms. Smith asserts that the "Heider Scale" contravenes this goal as it was created by Ms. Heider, was not approved by Aquila, and was not used by other supervisors. Moreover, none of the participants in the applicable calibration meeting questioned Ms. Heider regarding Ms. Smith's "marginal" rating.

Contrary to Aquila's assertion, Ms. Smith states the "marginal" performance rating was not consistent with a developmental position and did jeopardize her job. Two other employees rated "marginal" by Ms. Heider in 2001 were terminated. Ms.

Smith was rated as "meets" expectations in 2000; thus, the "marginal" rating was a downgrade rating. Ms. Heider stated that if an employee had a prior appraisal of fully competent and a subsequent lower rating, the employee needed to be given notice and opportunity for correction by being placed on an employee improvement plan. When Ms. Smith's performance rating went down, she was not placed on an employee performance improvement plan.

Aquila decided to reduce field operations by 500 persons. Aquila also decided to accompany that with a reduction in corporate staff. Mr. Morton stated there was not a plan to exclude corporate staff from the reduction; corporate staff should be reduced when field operations are reduced. Ms. Heider was a part of the discussions in February 2002 pertaining to reductions in field operations and corporate staff. Thus, she knew as early as February 2002 that a reduction in staff was coming.

Ms. Heider recommended the termination of three employees who had received a "marginal" rating. These employees were a Caucasian male, Caucasian female, and Ms. Smith—an African–American female. Ms. Smith was the only Senior Human Resources Representative–Field Generalist terminated. Ms. Smith applied for an open human resources job at Aquila in February 2003, after she had been terminated, but was not interviewed for the position.

Although Ms. Smith was informed that her position was being eliminated, she claims she, as opposed to her position, was eliminated. She further claims that a reduction in force did not occur because two Senior Human Resources Representatives were added to Ms. Heider's department immediately before Ms. Smith's termination. One of the new employees was transferred from a different department and one was a new employee. This new

employee had less human resources experience than did Ms. Smith. After Ms. Smith's termination, three others were hired into Ms. Smith's department. Moreover, at least two other employees were arguably in a developmental position at the time Ms. Smith was terminated.

Ms. Smith states that Mr. Morton did not approve her inclusion in the reduction. Instead, he was aware of her inclusion. Mr. Morton stated that he followed all the recommendations made to him for termination of employment. Ms. Smith claims her inability to identify any other employee who should have been terminated instead of her is irrelevant. Ms. Smith refutes that Ms. Heider terminated another employee for non-performance, stating that the employee resigned.

### Prima Facie Case

■ In its motion for summary judgment, Aquila conceded Ms. Smith could prove the first three elements of a prima facie case under the *McDonnell Douglas* burden shifting analysis: (1) she is a member of a protected class; (2) she was qualified for the position she held;[6] and (3) Aquila discharged her. It contended, however, that Ms. Smith could not establish the fourth element, that Aquila terminated her employment under circumstances that created an inference of unlawful race discrimination.

■ The fourth element of a prima facie case "can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race." *Juarez v. ACS Gov't Solutions Group, Inc.*, 314 F.3d 1243, 1246 (10th Cir.2003). It may also be shown with circumstantial evidence that the employee was treated less favorably than employees not in the protected class. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998). Ms. Smith, an African–American Senior Human Resources Representative, was terminated while several Caucasian Senior Human Resource Representatives were retained. Moreover, two Caucasian employees transferred into the HR Group just prior to Ms. Smith's termination. Aquila argues that these transfers occurred before Ms. Heider was aware that the reduction in force would impact the HR Group and these employees had more human resources experience. Ms. Smith cited deposition evidence from which the factfinder could determine that Ms. Heider was aware the reduction would impact the HR Group before the transfers. Further, Aquila has conceded that Ms. Smith's qualifications for her position is a triable issue. Moreover, "[t]he fired employee can make a prima facie case without showing she is as or more qualified than employees who are retained." *Id.* at 1168 n. 5. After Ms. Smith was terminated, three Caucasian employees were transferred into the HR Group. Aquila claims these employees were winding down another department that was completely eliminated; Ms. Smith disputes this.

Ms. Smith presented other evidence from which a factfinder could infer unlawful discrimination. Ms. Smith was the only African American in her department, and she received a satisfactory performance rating her first year in the HR Group. Ms. Heider was aware a reduction in force was to occur at Aquila in early 2002, and that is the timeframe in which the documentation of Ms. Smith's performance began. Without being told to do so, Ms. Hammond started a "supervisor's file"

**6.** Aquila questioned whether Ms. Smith could demonstrate this element, but stated it would not argue that she cannot create a triable issue as to her qualifications. Thus, it conceded this element was a disputed issue.

on Ms. Smith that grew to over 400 pages in one year, and it was the largest supervisor's file Ms. Hammond ever created. Yet, Ms. Hammond claims she had no criticisms of Ms. Smith. Included in this documentation were emails with subject lines reading "Gail documentation" and "an example on Gail." Ms. Heider and Ms. Hammond claim documentation was never requested pertaining to Ms. Smith. Within a year, Ms. Smith's performance rating decreased from "meets" expectations to "marginal." Yet, six out of eight of her customers gave her high marks. Ms. Heider used her own scale to evaluate Ms. Smith's performance, which consists of subjective criteria and is not utilized by Aquila. Ms. Heider gave Ms. Smith a "marginal" rating weeks before Ms. Hammond, Ms. Smith's direct supervisor, conducted her evaluation. Yet, Ms. Heider claimed she had no input into the rating given by Ms. Hammond. Immediately before the "reduction in force," two Caucasian employees were transferred into the HR Group. Three employees were terminated as a result of the reduction. The positions of two of the employees were eliminated; Ms. Smith's position was not eliminated. After the purported reduction, three Caucasians were hired into the HR Group.

Ms. Smith asserts the evidence makes clear Ms. Heider did not like her from the very beginning of Ms. Smith's employment in the HR Group in that she had misgivings about Mr. McDonald hiring her. She cites the position statement submitted by Aquila to the Missouri Human Relations Department that, soon after resuming her position as head of the HR Group, Ms. Heider recognized Ms. Smith's lack of background and skills needed by a Senior Human Resources Representative. Thus, she implies Ms. Heider had misgivings before she learned Ms. Smith lacked certain background and skills. She claims the

reason for Ms. Heider's dislike remains an issue of fact.

Aquila claims Ms. Smith is relying upon the size, as opposed to the quality, of the supervisor's file. It notes that the file contained documents reflecting positively upon Ms. Smith and her performance. Much of the content of the file is correspondence with Ms. Smith. Aquila argues that if the file were created to justify Ms. Smith's termination, it surely would have contained more documents reflecting negatively upon Ms. Smith. Aquila also claims that Ms. Heider knew of the reduction in force in areas other than the HR Group in early 2002; she did not know the reduction would affect the HR Group at that time. Ms. Smith presented deposition evidence and exhibits disputing these claims.

Aquila also asserts Ms. Smith's claim that her race was an issue in the reduction in force is significantly undermined by several facts. These facts include: (1) the reduction affected both Caucasians and an African–American; (2) Mr. Morton, an African–American, approved of her inclusion in the reduction; (3) Mr. Morton both approved Ms. Smith's hire into the HR Group and her termination within a short period of time. *See Chock v. Nw. Airlines, Inc.,* 113 F.3d 861, 864–65 (8th Cir.1997); *PAS Commc'ns, Inc. v. Sprint Corp.,* 139 F.Supp.2d 1149, 1169 (D.Kan.2001); *Grossmann v. Dillard Dep't Stores, Inc.,* 109 F.3d 457, 459 (8th Cir.1997). Aquila further points to the fact that Ms. Heider terminated one employee for non-performance. It claims that, before doing so, Ms. Heider did not offer any support to that employee as she did Ms. Smith. Thus, it concludes that Ms. Heider treated Ms. Smith more favorably than she did a Caucasian employee.

All these things may be considered by the factfinder and, if deemed credible and

of adequate weight, may undermine Ms. Smith's discrimination claim. For example, *PAS Communications, Inc.,* explicitly states that the fact an employer was a member of the same race as an employee does not preclude the employee from establishing a prima facie case of racial discrimination. 139 F.Supp.2d at 1168–69. Thus, a prima facie case may be established by an employee in spite of the existence of the facts identified by Aquila.

██ Aquila focuses on the fact that Ms. Smith cannot identify an employee who should have been terminated instead of her. It cites no authority indicating this admission is significant. That Ms. Smith cannot identify an employee who should have been terminated in her place does not necessarily mean that Ms. Smith's termination was not the result of racial discrimination. Aquila also claims Ms. Smith seeks favorable treatment based on her race. While these contentions may be factors affecting the trier of fact's decision, if admissible, they are not determinative in considering the viability of the summary judgment. Again, this assertion is not supported by evidence.

As demonstrated, Aquila and Ms. Smith present two different accounts of the events leading to her termination. Both accounts were supported by references to depositions and exhibits. The record is viewed in the light most favorable to Ms. Smith as she is the non-movant. *Wehmeyer,* 190 S.W.3d at 648. Ms. Smith presented sufficient evidence to establish a prima facie case under the *McDonnell Douglas* burden shifting analysis.

### Pretext

Aquila further argued in its motion for summary judgment that Ms. Smith was unable to rebut its legitimate, non-discriminatory reason for her termination with evidence of pretext. In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 139, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court of Appeals for the Fifth Circuit held that an employee had not introduced sufficient evidence to sustain the jury's finding of unlawful discrimination. It acknowledged that the employee may have offered sufficient evidence for a reasonable jury to find that the employer's explanation for its employment decision was pretextual. *Id.* It deemed this not dispositive, however, of the ultimate issue of whether the employee presented sufficient evidence that the prohibited criteria, age in this case, motivated the employment decision. *Id.* The court concluded the employee had failed to present sufficient evidence for a rational jury to conclude he had been discharged because of the prohibited criteria. *Id.* at 140, 120 S.Ct. 2097.

██ The United States Supreme Court granted certiorari to resolve a conflict among the Courts of Appeals as to whether a plaintiff's prima facie case of discrimination, as set forth in *McDonnell Douglas,* combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination. *Id.* The Court noted that the factfinder's rejection of an employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the employee. *Id.* at 146, 120 S.Ct. 2097. That evidence is presented demonstrating that the employer's proffered reason for the employment action is unpersuasive or obviously contrived does not necessarily establish that the reason for the employment action advanced by the employee is correct. *Id.* at 146–47, 120 S.Ct. 2097. "In other words, '[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimina-

tion.'" *Id.* at 147, 120 S.Ct. 2097 (citation omitted).

 Nonetheless, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id.

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."

*Id.* (citation omitted). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.*

In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 147–48, 120 S.Ct. 2097 (citations omitted). The Supreme Court also noted that, while the presumption of discrimination created by the prima facie case "drops out of the picture" once the defendant meets its burden of production demonstrating legitimate, non-discriminatory reasons for its actions, the factfinder may still consider the evidence establishing the plaintiff's prima facie case " 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' " *Id.* at 143, 120 S.Ct. 2097 (citation omitted).

Thus, Ms. Smith's prima facie case combined with the factfinder's disbelief of Aquila's proffered legitimate, non-discriminatory reasons for terminating Ms. Smith may be sufficient evidence of pretext. Nearly every one of the events preceding Ms. Smith's termination is disputed by the parties. Both Aquila and Ms. Smith provide citations to depositions and exhibits to support their asserted versions. Given this, the factfinder may very well disbelieve Aquila's proffered explanation.[7]

---

7. The question arises whether summary judg- ment would ever be appropriate in discrimi-

An employee may also "show pretext through disturbing procedural irregularities, including evidence that the [employer] acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the [employee]." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 372 F.Supp.2d 1246, 1255–56 (D.Kan. 2005)(quote marks and citation omitted). "Pretext can also be shown through weaknesses, implausibilities, inconsistencies, incoherencies or contractions in the employer's proffered legitimate reasons, such that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 1256. Ms. Smith presented evidence that Aquila acted contrary to its policies. Ms. Heider used her own scale, in addition to the approved Aquila rating mechanism, to rate the performance of her employees. This "Heider Scale" was not approved by Aquila, was not approved by Mr. Morton, and contained subjective criteria when Mr. Morton stated objective criteria should be utilized. Further, Ms. Hammond spoke with Ms. Heider, who did not believe Ms. Smith was in an appropriate position at Aquila, before rating Ms. Smith as "marginal." This rating was a decrease from her prior rating and was inconsistent with the results of a survey given to Ms. Smith's clients. Moreover, Ms. Smith was not put on an employee improvement plan when her performance rating decreased from "meet" expectations to "marginal" in contravention of company practice. In addition, the supervisor's file grew unusually large in the timeframe of approximately one year. The file was more than 400 pages, and Ms. Heider acknowledged that a file of 100 pages would be considered large. Ms. Heider transferred Ms. Smith to a difficult assignment at the Call Center and failed to give her support as she did with other employees. Ms. Smith was not given copies of valuable and helpful forms that were shared with other employees and was excluded from important meetings with clients. New employees were transferred into the HR Group just prior to and after Ms. Smith's termination. Ms. Smith's position was not eliminated as it continued to exist after her termination.

Aquila focuses on its assertion that Ms. Smith was not qualified for the position. Yet, it candidly admits this is a triable issue as Ms. Smith is able to present evidence from which a factfinder could determine she was qualified. Aquila also notes that the "Heider Scale" was applied to all of the employees under Ms. Heider. It claims she was not placed on an employee improvement plan when her performance rating decreased because she was in a developmental position. Aquila notes that the "marginal" rating was given by Ms. Hammond, not Ms. Heider. Further, the rating was approved at a calibration meeting. In addition, the "meets" expectations and "marginal" ratings were given by two different supervisors, and Aquila argues it is not unusual for different supervisors to rate the same employee differently. It contends that the customer survey results are of little value because the customers do not see the process; they only see the results. Aquila states that the supervisor's file was primarily composed of correspondence, contained documents reflecting positively upon Ms. Smith, and overall contained little that was critical of Ms. Smith. Aquila maintains that the two employees who transferred into the HR Group prior to Ms. Smith's termination had more experience and the three employees who transferred into the HR

nation cases where the employee has presented a prima facie case. It is not necessary for this court to address this question within the context of the facts of this case.

Group after her termination were winding down another department.

Aquila declares that the claimed factual disputes are nothing more than unsubstantiated theories and speculation. It further claims that Ms. Smith "cannot point to a single comment or a single action that suggests her race was an issue at Aquila other than that she was the only African–American in the Global Networks HR Group and that the [reduction] therefore resulted in the termination of the only African–American in the Group." It states this "coincidence" is insufficient to avoid summary judgment. It adamantly claims Ms. Smith's inclusion in the reduction was based upon her performance and not her race.

■■■■■ As amply demonstrated, Aquila and Ms. Smith present quite different accounts of the events leading to her termination. Both accounts were supported by references to depositions and exhibits. The record, however, is viewed in the light most favorable to Ms. Smith as she is the non-movant. *Wehmeyer*, 190 S.W.3d at 648. In disputing that Ms. Smith can establish pretext, Aquila focuses upon each piece of evidence proffered by Ms. Smith individually. It fails to address the situation created by all of Ms. Smith's proffered evidence as a whole. The ultimate issue is one of intent. The questions facing fact-finders in discrimination cases are both "sensitive and difficult," and there is seldom "eyewitness testimony as to the employers' mental processes." *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097 (quote marks and citation omitted). " '[T]he central purpose behind the *McDonnell Douglas* method is to relieve the employee of the burden of having to uncover what is very difficult to uncover-evidence of discriminatory intent.' " *Beaird*, 145 F.3d at 1167 (citation omitted). Summary judgment has been characterized as an "extreme and drastic remedy" because it denies a party its day in court. *Bargfrede v. Am. Income Life Ins. Co.*, 21 S.W.3d 157, 160 (Mo.App. W.D.2000). A party's knowledge, intent, motive, and the like are "elusive facts," and "[s]ummary judgment is rarely appropriate in these types of cases in which the facts must in nearly every case be proven by circumstantial evidence." *Wagner v. Uffman*, 885 S.W.2d 783, 787 (Mo.App. E.D.1994). The fact issue for determination in this case is the "real reason" Ms. Smith was terminated. Given the two varying versions of the facts, and that Ms. Smith's version could support a determination that her termination was the result of discrimination, summary judgment is not appropriate. *See Wey v. Dyno Nobel, Inc.*, 81 S.W.3d 208, 210–11 (Mo.App. S.D.2002); *Kummer v. Royal Gate Dodge, Inc.*, 983 S.W.2d 568, 572 (Mo.App. E.D.1998).

Aquila concludes that a decision that summary judgment is inappropriate in this case would effectively delete the rule providing for summary judgment from the Missouri Rules of Civil Procedure. It states that summary judgment is not an "extreme and drastic remedy." It notes that summary judgment conserves judicial resources and is an "integral" part of the Missouri Rules of Civil Procedure. *See Wood & Huston Bank v. Malan*, 815 S.W.2d 454, 457 (Mo.App. W.D.1991). The importance and utility of summary judgment is not doubted and certainly it should not be abolished. It is simply inappropriate given the facts of this case.

The point is granted, and the judgment is reversed.

All concur.